CASE 105.—ACTION BY THE COMMONWEALTH OF KENTUCKY AGAINST CALEB POWERS.—December 6, 1904.

## Powers v. Commonwealth.

Appeal from Scott Circuit Court.

From the judgment Caleb Powers appeals.

1. Homicide—Trial—Conduct f Counsel—Remarks to the Jury—Judgment—Suspension of Sentence.—Defendant and H. and others were jointly indicted for conspiracy to murder. It was the theory of the State that H. fired the fatal shot. On the separate trial of defendant the prosecuting attorney stated that "H. was not hung, but eleven of the twelve jurors who tried him were in favor of hanging him, and one was for life imprisonment, and eleven had to come to one." The motion to exclude this was overruled by the court, the defendant was convicted and the death penalty imposed. The case was involving intense political excitement and prejudices. Held, that the error of the court in not sustaining the motion was prejudicial.

2. Criminal Code, Sec. 283, provides that on verdicts of conviction in cases of felony the court shall not pronounce judgment until two days after the verdict is rendered, "unless the court should be about to adjourn for the term." Held, that, where a special term was called for the sole purpose of trying defendant for homicide, he was entitled to the two days granted by the Statute, and it was error for the court to pronounce judgment on the same day the verdict was rendered.

J. R. MORTON, JAS. SIMS, R. D. HILL, H. CLAY HOWARD, R. C. KINKEAD, S. M. WILSON, J A. VIOLETT and A. T. WOOD for appellant.

N. B. HAYS, LORAINE MIX, R. B. FRANKLIN, B. G. WILLIAMS, T. C. CAMPBELL, V. F. BRADLEY, JNO. K. HENDRICKS and DENNIS DUNDON for appellee.

SEPARATE OPINION OF THE COURT BY JUDGE BARKER on the Federal question involved.

Having written the opinion of the Court in this case on the only theory upon which a majority of the members could agree, the deep conviction I have on the Federal question contained in the record constrains me to express, in a separate opinion, my personal views on that subject.

The trial of this case, by a change of venue from Franklin County, where the indictment was found, took place in Scott County; but for reasons no doubt entirely valid, the jury was secured from Bourbon. When the officers were about to proceed to summon the jurors, the appellant moved the Court to instruct them to summon persons without regard to political affiliation. This was objected to by the Commonwealth, and the motion overruled, the court saying that he had instructed the officers as to their duties in the premises, and he had no reason to assume they would not perform their duty.

Two venires of one hundred persons each were ordered. Upon the appearance of the first, composed of ninety-five men, the appellant moved that they be discharged. He filed his own, and the affidavits of two others, to the purport, that the officers had, by a prearranged system of "exclusion" and "elimination," failed and refused to summon any person for jury duty, who was a Republican in politics, no mat-

ter how well qualified he might otherwise be; that, on the other hand, they had only summoned those who were what are called "Goebel Democrats" or partisan followers of the late William Goebel for whose murder the appellant was being tried; that this killing grew out of, and was the result of a bitter political contest for the office of Governor of the State between W. S. Taylor and William Goebel, which was being tried at the time the latter was killed; that these partisans of Goebel were exceedingly bitter against appellant, and that with a jury composed entirely of them he could not have a fair and impartial trial, and would thereby be deprived of the equal protection of the laws within the meaning of the 14th Amendment of the Federal Constitution.

The Commonwealth objected to this motion, and filed the affidavits of the officers denying all of the material allegations of the affidavits for the appellant, and affirmatively alleging that they had no prejudice against him, but, on the contrary, desired to see him have a fair and impartial trial; that the Republican party of Bourbon County was composed mostly of negroes who were not qualified for jury service, and of the whites nearly all were Federal office-holders and thereby disqualified as jurors.

The court overruled the motion, the order reciting: "Thereupon the court overruled the motion without any reference to the said affidavits, and the court holds, that there is not claimed in the grounds of said motion that said jurors are not sensible, discreet, and sober men, and housekeepers of Bourbon County, over the age of twenty-one years, to all of which defendant excepts."

The proceedings with reference to the second venire-was in all substantial respects similar to those regarding the first, except that no reason was given in the second order for overruling the motion to quash. After the panel of twelve was selected, the defendant moved the court to discharge them, for the same reasons, with a like result as before.

It is clear, that the trial judge was of opinion that it was not an offense against the 14th Amendment, or a denial of the equal protection of the laws of the refendant, to exclude Republicans from the jury solely because they were Republicans, provided the selected Democrats were possessed of the statutory qualifications required for jury service. There was no decision upon the evidence offered as to whether or not, in fact, there had been the discrimination complained of, it being necessarily assumed that this was, if true, an immaterial circumstance.

To this, I cannot agree; it is in contravention of our State, as well as the Federal Constitution. So much of the 14th Amendment as is pertinent to the discussion in hand is as follows: " * * * Nor (shall any State) deny to any person within its jurisdiction the equal protection of the laws."

The Supreme Court of the United States, the final arbiter in all matters involving the Federal Constitution, has uniformly held that the exclusion from juries, grand or petit, of persons belonging to a class, for the sole reason that they belonged to such class, is, as to a member of the excluded class being tried under a charge of crime, a deprivation of the equal protection of the laws. This question has generally arisen in cases involving the exclusion and trial of negroes. This might well be expected in the confusion of adjusting the rights of this race from their

former condition of slavery to that of citizens under the Thirteenth, Fourteenth and Fifteenth Amendments. But the application of the principle under discussion is not confined to the rights of negroes; it extends to every person—whatever his race, color or political affiliation—if his legal rights have been denied solely because thereof. Nor is it confined in its application to laws which on their face involve invidious distinctions in providing legal protection, but extends to, and forbids, such unjust discrimination, by the executive and administrative officers of the State.

It is said in Carter v. Texas, 177 U. S. 443: "Whenever by any action of a State, whether through its legislative, through its courts, or through its executive or administrative officers all persons of the African race are excluded solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied him contrary to the Fourteenth Amendment of the Constitution of the United States." To the same purport are Strauder v. West Virginia, 100 U. S. 303; Virginia v. Rives, 100 U. S. 313; Neal v. Delaware, 103 U. S. 370; Bush v. Kentucky, 107 U. S. 110; Yick Wo v. Hopkins, 118 U. S. 356; Torrence v. Florida, 188 U. S. 519, and Rogers v. Alabama, 192 U. S. 226.

In the case of the County of Santa Clara v. Southern Pacific R. R. Company, 18 F. R. 385, Justice Field adopting in part the speech of Senator Edmunds delivered in the United States Senate when the amendment was under discussion, said: "There is no word in it that did not undergo the completest scrutiny. There is no word in it that was not scanned and intended to mean.

the full and beneficial thing that it seems to mean. There was no discussion omitted; there was no conceivable posture of affairs of the people who had it in hand which was not considered. And the purpose of this long and anxious consideration was that protection against injustice and oppression should be made forever secure—to use his language—'secure, not according to the passion of Vermont, of Rhode Island, or of California, depending upon their local tribunals for its efficient exercise, but secure as the right of a Roman was secure in every province and every place, and secure by the judicial power, the legislative power, and the executive power of the whole body of the States and the whole body of the people.

"This protection attends every one everywhere, whatever be his position in society or his association with others, either for profit, improvement or pleasure. It does not leave him because of any social or official position which he may hold, nor because he may belong to a political body, or a religious society, or be a member of a commercial manufacturing or transportation company. It is the shield which the arm of our blessed government holds at all times over every one, man, woman and child, in all its broad domain, wherever they may go, and in whatever relations they may be placed."

In Yick Wo v. Hopkins, supra, the Court said: "These provisions (of the Fourteenth Amendment) are universal in their application, to all persons within the territorial jurisdiction, without regard to any difference of race, of color or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."

The provision of the equal protection of the laws is only a rule of justice and fairness; it creates no new system of procedure, but enforces equally that which it finds in force; it furnishes one charged with crime no shield for his protection not furnished to all, but it does require justice to bear her sword with equal hand, and hold her scales in equal balance.

To the proposition that, by Section 281 of the Code, we are without jurisdiction to pass upon this question because it forbids an exception to the ruling of the trial court on the organization of the jury, I reply that if the section is in the path of the full, free and fair enforcement of the constitutional provision in question, then it is to that extent void. Section 281 is as follows:

"The decisions of the Court upon challenges to the panel, and for cause, upon motions to set aside an indictment, and upon motions for a new trial, shall not be subject to exception."

It may be conceded that many utterances of this Court are to the effect that we have not jurisdiction to reverse a judgment in a criminal case because of a ruling of the trial court as to the impaneling of the jury; but we have never yet had before us, so far as I know, any case where the question involved the provision of the Federal Constitution under consideration; nor have we ever said that, if the decision of the trial judge on the qualification of jurors, or the organizing of the panel, was in violation of that instrument, we would not revise and correct it. To fail to do so would, in my opinion, be in contravention of the very letter of the Constitution. Article 6 of that instrument provides as follows: " * * * This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made,

or which shall be made, under the authority of the
United States, shall be the supreme law of the land;
and the judges in every State shall be bound thereby,
anything in the Constitution or laws of any State to
the contrary notwithstanding."

It might have been supposed that the words I have
italicized were unnecessary;—that, if the Constitution
was the supreme law of the land, it would necessarily
be binding on the judges of the States; but the
framers of the instrument deemed it best to place the
matter beyond the realm of dispute or argument,
and provided specifically the duty of the State judges,
in the matter of its enforcement.

But we are not without decisive authority both upon
our jurisdiction and our duty on this branch of the
case. The case of Bush v. Kentucky (107 U. S. 110),
bears especially upon this phase of the question.
Section 281 of the Criminal Code was contained ver-
batim in the old Code of Practice, and the case went
up to the Supreme Court on writ of error to our court,
and was reversed because it appeared that negroes,
as such, had been excluded from the grand jury who
returned the indictment under which the plaintiff in
error, a negro, had been tried and convicted. This
case completely answers the contention that we can-
not take jurisdiction of the question as to the proper
organization of the jury when the error complained of
is a violation of the Federal Constitution, unless we
are to occupy the anomalous position that we will re-
fuse to reverse the judgment of the circuit court for
an error when this refusal will furnish ground for a
reversal of this Court by the Supreme Court of the
United States.

In the case of Great Western Telegraph Company
v. Burnham, 162 U. S. 339, it was held: "This court

has no jurisdiction upon a writ of error, to review a judgment of a State Court, unless it was a final judgment by the highest court of the State in which a decision in the suit could be had, and against a right set up under the Constitution and Laws of the United States. Rev. Stats. U. S. 709.'' We cannot, therefore, divest ourselves of the duty of enforcing the right of the accused to ''the equal protection of the laws;'' we cannot concede to the Federal judiciary a monopoly of this provision of the national constitution.

But the appellant is not forced to resort to the Federal Constitution for the right to a fair and impartial trial; this is guaranteed to him by the Constitution of the State of Kentucky. Section 11 of that instrument is as follows:

''In all criminal prosecutions the accused has the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor. He cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the laws of the land; and in prosecutions by indictment or information, he shall have a speedy public trial by an impartial jury of the vicinage; but the General Assembly may provide by a general law for a change of venue in such prosecutions for both the defendant and the Commonwealth, the change to be made to the most convenient county in which a fair trial can be obtained.''

The provision, that the accused ''shall have a speedy public trial by an impartial jury of the vicinage'' is found in every constitution adopted by the people of Kentucky; they are not idle words; they

constitute one of our most sacred possessions, and have justly been regarded as a tower of strength in the foundation of our liberty.

The provision "but the General Assembly may provide for a change of venue in such prosecutions for both the defendant and the Commonwealth, the change to be made to the most convenient county in which a fair trial can be obtained," is of itself an answer to the contention that a jury, who possesses the ordinary statutory requirements, is all to which the defendant is entitled. Why change the venue, unless prejudice and passion are recognized impediments to a fair and impartial trial? Surely the framers of the constitution did not suppose that there was a county in the State in which a jury could not be obtained possessing all of the statutory qualifications. Therefore, it must be assumed that prejudice and passion, whether it be political prejudice and party passion, or prejudice and passion of any other sort, being impediments to a fair and impartial trial in the sense that would authorize a change of venue, also constitute impediments thereto in making up the trial panel; the object in both cases being to secure to the accused the constitutional guaranty of a trial by an impartial jury.

I do not insist that, in ordinary criminal trials, there is any necessity for watchfulness to keep politics out of the jury box. When, ordinarily, one is arraigned for crime, it is immaterial whether the jurors are of the same or an opposing political party; usually, this is a question which excites neither the interest of the accused, nor that of his counsel; but when the offense springs from an intense political contest, all becomes different; then the political complexion of the jury is all-important.

The administration of even-handed justice has no more insidious enemy than political prejudice; it enters unseen and unsuspected into the human mind, corrodes the reason, and undermines the judgment; neither purity of heart, nor exaltation of character, affords an antidote for this deadly poison; indeed, these virtues may well magnify the evil; for the mind thus possessed, is all the more ready to enforce the oblique judgment, when it has no cause to suspect its own integrity. The pages of history are eloquent with the evils of this passion. It is recorded that the ferocious soldiery sent to harry the inhabitants of Somersetshire after the rebellion of 1865, although disciplined in the rapine of Tangier, inspired the followers of unhappy Monmouth with less terror than did Lord Jeffries with his "forms of law" and courtly juries; that when the English Government established the common law of India, the native who found himself entangled in its meshes, though schooled by fatalism to smile in the face of death, was frozen with terror in the presence of a mysterious system whose procedure was in an unknown tongue, and whose verdicts were rendered by unsympathetic strangers from across the sea.

Those conversant with current history, have seen a highly civilized and generous people under stress of radical passion condemn without proof a soldier charged with a political crime, and sentenced him without mercy to a punishment worse than death; and yet when the storm had spent its force that judgment was annulled, the victim released, and all the world now knows his innocence.

To prevent such miscarriage of justice, the constitution of the nation prohibits a denial of the equal protection of the laws, and the common law, since

Runnymede, guarantees a trial by an impartial jury
of the vicinage.

I do not believe that any man charged with a polit-
ical offense, or with an offense originating in a politi-
cal contest, who is tried by a jury composed wholly of
his political opponents, can have a fair and impartial
trial within the meaning of the law. Nor do I believe
that it is a valid excuse to say there are no qualified
jurors of the party of the accused in the county where
the jury is summoned, when there are other counties
in which this adverse circumstance does not exist.
The securing of a fair trial under all circumstances
is of more importance to the Commonwealth, than the
punishment of any particular defendant, no matter
what his guilt.

Nothing so surely tends to enhance the respect men
owe to the law than a fairly rooted conviction that its
judgments are the offspring of even-handed justice;
and of its temple, an impartial jury is the chief cor-
ner-stone. On the other hand, nothing is so certainly
productive of distrust and fear, out of which springs
anarchy, as a well grounded suspicion that judicial
procedure is tainted with partiality and indirection.
That conviction forms the basis for the love of the
citizen of his State in return for "the equal protec-
tion of the laws;" and this suspicion engenders the
scorn and hatred which all good men entertain for
that oriental system of judicature with whose decrees
the chance of the dicer's box is honest by comparison;
and of this suspicion a partisan jury is the most
effective promoter.

In conclusion, I am of opinion that the trial judge
should have passed upon the question of fact pre-
sented by the appellant as to the summoning of the
jurors, and if there was even a well-grounded sus-

picion that unfairness had prevailed the jury should have been discharged, and others summoned under such safeguards as would preclude indulgence in partisan methods.

JUDGE O'REAR CONCURRING.