## Belcher, et al. v. Commonwealth.

(Decided June 18, 1915.)

Appeal from Pike Circuit Court.

1. Criminal Law—Homicide—Evidence—Sufficiency.—On a trial for homicide, evidence considered and held sufficient to sustain a conviction of murder.

2. Witnesses—Leading Witnesses—Reversal.—A judgment of conviction will not be reversed on the ground that the Commonwealth's Attorney led the witnesses for the Commonwealth, where there was no objection by the defendant or where the evidence was not material and the Commonwealth's Attorney was merely recapitulating what the witness had already testified to.

3. Criminal Law—Trial—Continuance—Error.—It was not error to refuse a continuance on the ground of absent witnesses, where the trial did not take place at the indictment term and the affidavit was read as the depositions of such witnesses, and other witnesses testified to the same facts which it is claimed the absent witnesses would have testified to.

4. Criminal Law—Instructions.—Where, on a trial for homicide, the court instructs the jury, as to one of the defendants, that he being a deaf mute he could not be convicted, unless the jury believed from all the evidence, beyond a reasonable doubt, that at the time mentioned in the evidence he was of sound mind, had sufficient reason to know what he was doing, and to know right from wrong, and had sufficient will power to 'govern his actions, it was not error to give an instruction telling the jury that if such defendant was of a feeble mind they should find him guilty of the lesser offense of voluntary manslaughter.

5. Criminal Law—Deaf Mute—Incapacity for Crime.—The fact that one is a deaf mute does not render him incapable of committing a crime. It is simply a circumstance to be considered in connection with the other evidence on the question.

STATON & PINSON, J. M. BOWLING and CHILDERS & CHILDERS for appellants.

JAMES GARNETT, Attorney General, and CHARLES H. MORRIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

The defendants, George Belcher, Harrison Belcher and Bart Belcher were convicted of the murder of John Belcher, and each given a life sentence in the penitentiary. They appeal.

The facts are these: The defendants are brothers. At the time of the alleged homicide Bart Belcher was 19 years of age, George; 22 years of age and Harrison,. 24 years of age. When George was four years of age. he had fever. From that time on he was deaf and dumb. John Belcher, the man who was killed, was about 20 years of age and was the first cousin of the three defendants. On the day before the homicide George, the deaf mute, and John, the deceased, had a difficulty. Some of the witnesses say that George struck John without provocation, whereupon John knocked him down. Other witnesses say that John, without provocation, cut George with a knife. According to the evidence for the Commonwealth, John Belcher, the deceased, was employed by a man by the name of Keaton, a railroad section foreman. On the day of the homicide, he, Keaton and others were on a hand car and were engaged in "lining up" the track. As they approached the end of a cut, Keaton looked up and saw George and Bart Belcher coming down the railroad. Keaton had heard of the difficulty between John and George. Realizing that John was in danger, Keaton shoved him off the car, gave him a water bucket and told him to go to Riley Mullin's house and remain until called for. When John left the car and started towards Mullin's house, George Belcher, the deaf mute, threw up his pistol and shot at him. John was not struck and immediately began to run. George fired again, and Bart, the other brother, stepped across the track, so as to get sight of John, and also fired. At this point Harrison Belcher appeared on the scene. He was coming down the county road on a mule. He jumped off the mule and came to the car. Keaton told him not to go down there and kill John, whereupon Harrison threw up his pistol and threatened to kill the whole party. There is testimony to the effect that Harrison fired one shot towards John. Some witnesses say that while they were standing near the car and after John had fled, Harrison said: "God damn him, he cut my brother and we are going to kill him." Bart also said: "God damn him, he stuck a knife in my brother and we are going to kill him." Harrison and George then started after John and Bart went through the cut. John went on to Riley Mullin's house. After getting in the house John went to the door and looked towards George and Harrison, who were together.

George fired his pistol and the shot took effect in John's abdomen. John died about a half hour later from the effects of the wound.

Harrison Belcher testified that he spent part of the night before with Morg Killen. On the morning of the homicide he started to the Potter Fork of Boone, where he had been "logging." On the way he stopped at John Adams' place, where he found his father very drunk. He stayed around a while looking after his father and finally started home with him. He could not get his father to go home, so he started back the other way to John Davis Bentley's. When he got there he found George. He sent George for a mule to help carry his father home. George brought the mule and they started down the creek. As they proceeded down the creek they heard some shots on the railroad. Harrison then ran over to the railroad and found George and Bart there. He saw John Belcher, the deceased, run towards Riley Mullin's house, but didn't see George follow John. He and Bart started through the cut and someone told them to go and get George to come back. Harrison insisted on Bart's going and Bart insisted on Harrison's going. Harrison claims that he went and on catching up with George tried to get him to come back. He says that when they got near Mullin's house John was standing in the doorway with a pistol pointed in George's direction, and that before he could stop George, George fired. Bart explains his presence at the homicide in the following way: He had been working for Shack Steele. On the day of the killing, he had broken a skein on his wagon and he and Steele agreed to go to Mr. Adams' and get a skein. In going back from Adams' place he came across the party who had charge of his father, who was drunk. He assisted in getting the old man on the mule and then he and George and two smaller brothers started down the railroad. Pretty soon they saw the section crew approaching. When they pulled to the upper end of the cut the hand car stopped. John Belcher got off, put the water bucket over his left arm got out his pistol and started towards Riley Mullin's house. As he stepped over the knoll, George shot two shots. Then John Belcher threw his pistol towards George and witness. George then shot again. After proceeding a little further down, John put his elbows on his knees and fired one or two shots. One of these shots grazed witness' hair. As soon as this happened he shot

four shots at John. Thereupon John dropped his pistol and again started for Mullin's. He claims that he didn't go with Harrison and George, but admits that he joined Harrison on the railroad a very short time after the killing. After the homicide George fled, but Harrison and Bart were arrested together. There is some evidence to the effect that Bart showed signs of glee on learning that John had been shot and killed. It also appears that Harrison and Bart knew of the assault made upon their brother by the deceased.

Defendants insist that the evidence is not sufficient to sustain the verdict. Each of the defendants was indicted as principal and as aider and abettor. While the defendants account for their presence at the place of the homicide in a very plausible way, the facts to which they testify are not very convincing. George had been injured by the deceased. Bart and Harrison knew of this fact. Each of the defendants was armed. That they accidentally happened to meet in the cut where deceased was employed does not appear at all reasonable. Considering the fact that they all appeared about the same time; that Bart and Harrison announced their purpose to kill the deceased; that Bart did fire four shots at him and Harrison probably one shot; that George pursued the deceased to the home of Riley Mullins; that Harrison accompanied George, though claiming that he tried to stop him, it was clearly within the province of the jury to conclude that the homicide was not one committed in sudden affray or in sudden heat and passion, but was the result of premeditated design on the part of all three of the defendants.

Our attention is called to two or three instances where it is claimed that the Commonwealth's Attorney led the witnesses for the Commonwealth. In the only instance where the evidence elicited by that method of examination was material, there was no objection on the part of defendants. In the other instances, the evidence was not only not material but the Commonwealth's Attorney was merely recapitulating what the witness had already testified to. We see no reason, therefore, for reversing the judgment on the ground that the Commonwealth's Attorney led the witnesses for the Commonwealth.

Another reason urged for reversal is the refusal of the trial court to grant a continuance, on the ground of absent witnesses. The trial did not take place at the

indictment term but at a subsequent term. The affidavit was read as the depositions of the absent witnesses. Not only so, but other witnesses testified to the same facts which it is claimed the absent witnesses would have testified to. Under these circumstances, there was no error in refusing the continuance. Williams v. Commonwealth, 13 R., 753, 18 S. W., 1024; Simmons v. Commonwealth, 13 R., 839, 18 S. W., 534; Trabune v. Commonwealth, 13 R., 343, 17 S. W., 186; Roberts vs. Commonwealth, 94 Ky., 499, 15 R., 341, 22 S. W., 845.

We deem it unnecessary to set out at length the instructions. It is sufficient to say that, in our opinion, they accurately and clearly present the law of the case. Under this heading it is claimed that the jury should have been told that if they believed that defendant, George Belcher, was guilty under either the first or second instruction, but further believed he was of a feeble mind, they should find him guilty of the lesser offense of voluntary manslaughter. It is true that in the case of Mangrum v. Commonwealth, 19 Ky. Law Rep., 94, this court held that an instruction which gave the jury the right to consider the defendant's mental condition in fixing the degree of his guilt was as favorable as the accused was entitled to, yet the instruction given in this case was more favorable to the accused than the one approved of in the case cited. In the present case the court told the jury that the defendant, George Belcher, being a deaf mute, he could not be convicted unless the jury believed from all the evidence, beyond a reasonable doubt, that at the time mentioned in the evidence the defendant was of sound mind, had sufficient reason to know what he was doing, and to know right from wrong, and had sufficient will power to govern his action. In other words, the instruction authorized an acquittal for mental incapacity, instead of a conviction of manslaughter. Under these circumstances, the refusal to give the suggested instruction was not prejudicial error.

It is further insisted that the trial court should have held that defendant, George Belcher, being a deaf mute, was incapable of committing the crime in question. We are not aware that such a doctrine has ever been announced by the courts. The fact that the defendant is a deaf mute is simply a circumstance to be considered in connection with the other evidence in determining whether or not he was mentally capable of com-

mitting the crime. On this phase of the case the evidence was conflicting and the question was one peculiarly for the jury.

A careful reading of the record convinces us that no error prejudicial to the substantial rights of the defendants was committed on the trial.

Judgment affirmed.