## Douthitt v. Commonwealth.

(Decided February 8, 1918.)

### Appeal from Scott Circuit Court.

1. Criminal Law—Continuance—Discretion of Court.—In order to entitle a defendant in a criminal prosecution to a continuance on account of the absence of witnesses, diligence on the part of the defendant to obtain such witnesses must be shown.

2. Criminal Law—Continuance.—Where the homicide occurred in December, and the indictment was returned at the February term following, and at that term defendant moved for a continuance to the May term, which was granted, and on the calling of the case at the May term the case was set for the 11th day of June for trial, it was the duty of the defendant to immediately procure subpoenas for his witnesses and place the same in the hands of the proper officers for execution.

3. Criminal Law—Continuance—Affidavit For.—An affidavit for continuance, stating that subpoenas for witnesses were obtained from the clerk and placed in the hands of certain sheriffs, but without giving the date of the issual of the subpoenas or the time they were placed in the hands of officers for execution, amounts to no more than an allegation that subpoenas were issued and placed in the hands of the officer on the day and immediately before the making of the affidavit.

4. Criminal Law—Continuance—Affidavit For.—An affidavit for continuance to manifest diligence must show what process, if any, has been obtained for the witnesses and with what officers the same was placed for execution, the place where the witnesses may be found, and that there is reasonable opportunity of obtaining the presence of such witnesses; and it should further be shown that such witnesses are not absent by the procurement or consent of the defendant.

5. Criminal Law—Continuance—Affidavit For—Depositions.—Unless the affidavit shows facts amounting to diligence the trial court is not justified in granting a continuance, nor in allowing the affidavit to be read as the deposition of the witnesses.

JOHN FORD, JR., for appellant.

CHARLES H. MORRIS, Attorney General, and D. M. HOWERTON, Assistant Attorney General, for appellee.

### OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

On a trial of Charles Douthitt, indicted in the Scott circuit court for the wilful murder of Vernon Simms, the jury returned a verdict finding Douthitt guilty and fixing his punishment at death. In his motion and grounds for a new trial, Douthitt relies upon three alleged errors of the trial court, stated as follows:

First. Because the verdict is contrary to law and evidence and was the result of passion and prejudice on the part of the jury.

Second. Because the court erred in giving instructions Nos. 1, 2, 3, 4, and 6, to the jury, to all of which the defendant objected and excepted at the time and still excepts.

Third. Because the court erred in overruling the defendant's motion for continuance of this case until the next term of this court, to which the defendant objected and excepted at the time.

In the brief for appellant no mention is made of either the first or second grounds stated in the motion, but appellant relies exclusively upon the third ground stated therein, the failure of the lower court to sustain appellant's motion for a continuance at the June term of the court. Appellant's plea was insanity. He did not testify, but he called witnesses to testify concerning his alleged mental derangement.

Douthitt is about twenty years of age; Vernon Simms whom he killed, was about seventeen years old. Douthitt was a resident of Scott county, but Simms lived somewhere in the mountains of Kentucky. They were both farm hands working in the vicinity of Payne's depot. In the first part of December, 1916, they went to Lexington together and, after procuring some whiskey, got drunk on their way home. Simms fell out of the wagon and Douthitt alighted and lifted Simms back into the wagon. When they arrived home Douthitt fell upon Simms in an effort, as the witnesses say, to kill him, but owing to the interference of neighbors and friends, Simms was but slightly hurt. On the 31st day of December, Simms and two companions were standing in the public highway, talking, when Douthitt, who was riding with two other young men in a buggy, drove up; Douthitt got out and came to where Simms and the other young men were standing, and this conversation is related by one of the witnesses; Douthitt said: "Bill (Vernon Simms) I see you are not buried yet;" and Simms says, "No, sir, and I did not come up here with any intention to be buried;" then Douthitt said, "What have you got to say about it?" Simms answered, "I think it was a damn dirty trick the other night;" and Charles Douthitt began cursing him (Simms) and I do not recollect what he spoke, and Vernon told him, he

says, 'Don't go no further;' and he says, 'I don't want no trouble with you,' and he jerked the pistol out and says, 'You damned son-of-a-bitch, you have got to have trouble;' and began firing and fired two or three times while he was standing or he was running and once after he fell; and my father (Mr. Johnson) run out the door and he drew the gun on him." The memory of the witness was then refreshed by questions:

"Q. Didn't he say something about a 'damned hill-billy?' A. Yes, sir; he says, 'You need not think a damned hill-billy can come up here and run over a blue grass boy;' and Vernon says, 'Nobody is trying to run over you.' Q. And then is when he told him he did not want any trouble and he called him a damned son-of-a-bitch, and he commenced shooting him? A. Yes, sir. Q. How far did Simms run? A. I suppose thirty yards. Q. During all this trouble did Vernon Simms at any time draw a weapon, pistol, or knife, or anything and move towards Douthitt with a weapon of any kind A. No, sir; none at all. He jumped behind me when he saw the gun, but he did not get clean behind me."

Further testifying the same witness stated:

"He (Douthitt) stopped and tried to raise a racket with me; he said to me, 'he says: 'I understand you throwed a clod at me that night;' and I says: 'If it was not me it was somebody that looked mightily like me.' Q. What night are you referring to? A. About three weeks before he killed Vernon Simms."

Another witness named Walter Moore testified for the Commonwealth, as follows:

"Well, me and Henry and Vernon Simms was up there talking, we were up there together and Charlie got out of the buggy and came up there where we was and stopped there and talked about a minute, I guess, and we was talking and laughing and Charlie—and Vernon, they called him Bill, and Charlie, he says: 'Bill, I see you are not buried yet;' and Bill says, 'No, I didn't come up here with the intention of being buried;' and Charlie says, 'What have you got to say about it;' and Vernon said, 'I haven't got a word to say—I think that was a dirty trick.' (Don't know what they were talking about), and Charlie says, 'No hill-billy can come down here and try to run over a blue grass man;' and Vernon said, 'Nobody is trying to run over a blue

grass man;' he says, 'Don't go no further;' and I understood Charlie to say 'God damn you,' or something like that, and hadn't no more than said it until he shot him. Q. What was Vernon Simms doing before he fired? A. Nothing. Q. Did he have or make any move towards him, or anything of that kind? A. No, sir, Q. What happened then—how many times did he shoot? A. He shot three or four times—I don't know which. Q. What became of Simms—did he stand still? A. No, sir; he ran about fifteen or twenty-five or thirty yards. Q. Did he fall? A. Yes, sir; he ran and fell. Q. After he fell what did Douthitt do? A. Turned and ran. Q. After Simms fell did he fire any more shots? A. Yes, sir; he fell and he shot just as he fell."

Douthitt was indicted at the February term following the killing in December. The case was, on motion of appellant, continued to the May term. Upon the calling of the case for trial the Commonwealth announced ready, and Douthitt, by his attorney, announcing not ready, moved the court for a continuance, and filed in support of his motion the following affidavit:

"The affiant, Chas. Douthitt, says that he is the defendant in this prosecution.. That he is not ready for trial herein because of the absence of G. D. Sebree, Mrs. G. D. Sebree, Will Douglas, Walter Douglas, and G. R. Foster, all of which are material witnesses for the defendant. That he has exercised due diligence in an effort to procure the attendance of said witnesses, and that on the —— day of ——, 1917, he had issued by the clerk of the Scott circuit court, subpoenas for said witnesses, which subpoenas were placed in the hands of the sheriffs of Scott, Woodford and Fayette counties, upon the date on which they were issued.

"The affiant says that if given further time he has reasonable grounds to believe and does believe that he can secure the attendance of said witnesses, G. D. Sebree, Mrs. G. D. Sebree, Will Douglas, Walter Douglas and G. R. Foster.

"Affiant says that said witnesses would testify if present, that they have known this defendant for a number of years and they know said defendant to be subject to spells that would last for days, and that during the time that these spells lasted that the said defendant was void of all mind and memory, and that during the time that these spells lasted, that this defendant did

not have mind enough to know or discriminate between right or wrong and that at the time of the happening as charged in the indictment that this defendant was in one of these spells to which he was subject and did not at that time know what he was doing.

"That said witnesses saw said defendant on day of the happening and that he was in one of said spells and as they believed did not know right from wrong, or what he was doing.

"Affiant says that he believes that said facts, which if said witnesses were present would testify to are true; that testimony of said witnesses are material to affiant's defense herein and that affiant can not have justice without the testimony of said witnesses.

"Affiant says that this motion is not made for delay, but because of the materiality of the testimony of said witnesses to the affiant's defense herein, and that this motion is only made in order that justice may be done affiant on this trial.

"(Signed)        CHARLEY DOUTHITT.

"Subscribed and sworn to this 11th day of June, 1917, by Charles Douthitt.

"LEWIS FINLEY."

The court overruled the motion for a continuance, but allowed the affidavit to be read as the deposition of the witnesses named therein, and this is the chief ground of complaint relied upon in this appeal.

The case was not tried at the appearance term, which was February, but was continued to the May term. The affidavit contains the names of five witnesses whom defendant says he desired to attend and testify in person. It will be observed the affidavit contains the following: "On the ―― day of ―――――――, 1917, he had issued by the clerk of the Scott circuit court, subpoenas for said witnesses, which subpoenas were placed in the hands of the sheriffs of Scott, Woodford and Fayette counties, on the date on which they were issued." The trial was had on the 11th day of June, 1917; the affidavit was filed upon that day, and in the absence of a specific date fixed in the affidavit, it must be presumed that the subpoenas mentioned in said affidavit were issued and placed in the hands of the sheriffs of Scott, Woodford and Fayette counties on the 11th day of June, and immediately before the filing of the affidavit. If the subpoenas were ever served upon any one or more of the

witnesses named in the affidavit, the affidavit does not manifest this fact; nor does the affidavit show the whereabouts of said witnesses, or any one of them; their residence is not stated nor does it show where any one or more of said persons could be found. The affidavit does state that copies of the subpoenas were delivered to the sheriffs of Scott, Woodford and Fayette counties, but so far as the affidavit shows no one of the said witnesses resides in either of said counties. This court in the case of Kindall v. Commonwealth, 19 S. W. 173, in passing upon the question of diligence of the defendant said:

"The affidavit for a continuance does not show proper diligence. It says that a subpoena for the witnesses named in them were sued out and placed in the hands of the proper officer, but it does not say when this was done. It may have been but a few minutes before the case was called for trial."

In the case of Vogt v. Commonwealth, 92 Ky. 68, it is said:

"Diligence in procuring attendance of witnesses is a pre-requisite to continuance on application of the defendant in a criminal case, and the court is not authorized to grant it unless the fact of such previous diligence is made to appear."

Again this court in the case of Arnett v. Commonwealth, 71 S. W. 635, in refusing a reversal on account of an alleged error in overruling a motion for continuance said:

"The affidavit filed in support of this motion fails to state that the witnesses whose testimony the defendant desired to avail himself of, were not absent by his *consent* or *procurement,* or where they were *at that time,* or what grounds existed for the expectation that their testimony might be procured if the case was continued."

It must be borne in mind that appellant was not tried at the appearance term of the indictment, and that the affidavit, though showing no diligence on his part, and wholly insufficient to warrant the court in granting a continuance, was nevertheless, allowed to be read to the jury as the deposition of the witnesses named therein. This was more than appellant was entitled to under the state of the record.

The only case cited in brief for appellant is Murphy v. Commonwealth, 92 Ky. 485. Murphy was indicted for the wilful murder of his father. The facts of that case show that Murphy was an illiterate young man, descended from a line of lunatics. The affidavit filed in support of a continuance in that case was at the appearance, or indictment term. In this case, however, the indictment was returned upon the 9th day of February, 1917; thereupon this order was entered: "This day came attorney for defendant and after waiving formal arraignment, entered a plea of not guilty to the charge contained in the indictment, and on motion of the defendant, this case was ordered continued to the next May term of this court." On the 29th day of May, 1917, this order was entered: "On motion of attorney for Commonwealth, this case is ordered assigned for the 11th day of this term to be tried." The eleventh day of the term fell upon the 11th day of June, 1917, the day upon which the trial was had. What efforts appellant, or his counsel, made to procure the attendance of the witnesses other than that shown in the affidavit is unknown. There being no diligence shown the lower court would not have been justified in granting a continuance. While a continuance rests largely in the sound discretion of the trial judge, where it is sought on account of the absent witnesses, some reasonable diligence must be shown.

By the affidavit it is stated that the five witnesses would testify concerning the mental state of appellant. No one of the five witnesses was present at the time of the killing, but quite a number of persons were either present or nearby and saw Douthitt about the time of the killing, and each one who testified upon the subject thought appellant possessed sufficient mental grasp to know right from wrong.

Douthitt called Mrs. Thomas Douthitt and Thomas Douthitt, his mother and father, who testified concerning his enfeebled mental condition; and in addition called Peter Feeney, Willie E. Nutter, Henry Duncan and John Lewis Thomas. These six witnesses were in addition to the five whose names were included in the affidavit. Peter Feeney is a merchant and he testified concerning Douthitt's mental condition upon an occasion when Douthitt came to his store and was complaining of his eye and told Feeney that he was going to have

the eye removed, and later told him he had it taken out, all of which was true, and stated to Feeney, "I would rather have it out than to have it paining me like it has been." Upon this state of facts Mr. Feeney expressed the opinion that the young man was of unsound mind. Feeney also stated that Douthitt was a whiskey drinker, but the conversation related by Feeney does not justify the conclusion he reached. On the contrary Douthitt may have exercised good judgment in having the eye removed. Feeney was then asked by attorney for the Commonwealth:

"Q. You think he (Douthitt) knows right from wrong? A. Yes, sir; I think so. Q. He knows better than to kill a man without any cause? A. I should think so."

Willie Nutter testified that he saw Douthitt on the day of the killing after the occurrence, and that he found him sitting in his (Nutter's) kitchen, and he was then asked:

"Q. What was his condition when you found him? A. He seemed to be excited and nervous. Q. Where was he? A. Sitting in my kitchen with a pistol on his lap. Q. Did you have any conversation with him? A. I just walked in the kitchen and he was sitting there with this gun in his lap, and I says, 'What is the matter, what have you been doing?' and he says, 'I killed a fellow up here;' and I says, 'How came you to do it?' and he says, 'I had to do it.' "

Upon cross-examination Mr. Nutter said in answer to questions:

"Q. He didn't appear to be crazy to you, did he? A. No, sir. Q. Any more excited than anybody would be who had just killed a man, was he? A. I wouldn't think so."

Henry Duncan (a prisoner) was next called and stated that he had known Douthitt about three months at the jail since the killing. He was asked these questions:

"Q. What has been his actions down there in jail? A. Nothing only laughing and talking and playing cards. Q. Did he act just like any other sound man? A. Yes, sir."

John Lewis Thomas was introduced, and after stating that he had known the defendant since his birth,

but had not been with him much for seven or eight years, he was asked as follows:

"Q. At the time you knew him was he subject to spells? A. He would have mad spells and act funny most of the time. Q. In your opinion at the time he would have them, was he mentally capable of knowing right from wrong?" (Objection; sustained). "Q. Tell what he would do at that time? A. He would be playing with the rest of us boys and everything moving along nice as you please, and he would get mad all at once at nothing and want to fight and break up everything we were doing. Q. Would he go into a sort-a fit?" (Objection: sustained). "Q. How often did these spells come on him? A. Almost any time, two or three times a day when he was a kid. Q. You have not known him much since? A. No, sir; not since they moved away from the place, in 1908, I believe.

On cross-examination this witness was asked:

"Q. You say he would get mad and want to break up the playing? A. Yes, sir. Q. Just a sort of a bully? A. He was not exactly a bully; it looked like just for meanness more than anything else. Q. Is this boy about your age? A. No, sir; he was much smaller than me."

The witnesses introduced by appellant, other than his father and mother, to show his lack of mental capacity, failed to sustain the issue. Their testimony rather supports the contention of the Commonwealth that the boy was vicious.

There is some evidence tending to prove that the appellant was under the influence of intoxicants at the time of the killing, but this is not fairly established by the evidence. Even if that be true, voluntary drunkenness can not be a defense to a criminal prosecution. It may, however, be shown to support the contention of the defendant that there was want of motive, but appellant did not rely upon this. The evidence strongly supports the verdict, and there is no error in the instructions given to the jury.

After a very careful examination of the entire record and consideration and discussion by the whole court of every question raised, we are not only unable to find error prejudicial to appellant warranting this court in reversing the judgment entered below, but we are

thoroughly convinced that appellant was afforded a fair trial.

Judgment affirmed; whole court sitting and concurring.