## Blair v. Commonwealth.

(Decided June 21, 1918.)

## Appeal from Graves Circuit Court.

1.  Appeal and Error—Law of the Case.—Where the proof is substantially the same upon the second trial as it was upon the first, the opinion of the Court of Appeals on an appeal from the first judgment states the law of the case for the second trial.

2.  Criminal Law—Bloodhounds—Evidence as to Training.—Testimony as to trailing by bloodhounds of one charged with crime, may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime, only after it has been shown by some one having a personal knowledge of the facts, (a) that the dog in question is of pure blood and of a stock characterized by acuteness of scent and power of discrimination; (b) is itself possessed of these qualities and has been trained or tested in the tracking of human beings; and (c) that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted and at the point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated had been made by him.

3.  Criminal Law—Verdict—Signing Verdict.—Where an unsigned verdict was returned and the jury was discharged, but did not leave the court room, and the defect was discovered after the jury had begun the trial of another case, the trial court properly permitted one of the jurors to sign the verdict, and upon the jury being polled in the presence of the accused to reaffirm its verdict as originally returned.

4.  Criminal Law—Former Conviction—How Shown.—A former conviction of a felony must be shown by the introduction in evidence of the indictment, verdict, judgment and sentence of the former trial, or certified copies thereof.

5.  Criminal Law—Third Conviction for Felony—Statute.—Section 1130 of the Kentucky Statutes providing that every person convicted a third time of felony shall be confined in the penitentiary during his life, does not require that the first and second felonies of which the defendant was convicted should be the same character of felony as that for which he was finally convicted; the life sentence may be imposed although the first and second convictions were for felonies different in character from that which was the basis of the third conviction.

6.  Continuance—Discretion of Court.—The granting of a continuance is largely left to the sound discretion of the trial court, and unless that discretion is abused it will not be disturbed.

7.  Trial—Instructions.—Instructions that were approved upon the
    first appeal of a case will be treated as the law of the case
    for subsequent trials under substantially the same facts.

WEBB & WEAKS for appellant.

CHARLES H. MORRIS, Attorney General, and OVERTON S.
HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is the second appeal by appellant from a verdict and judgment convicting him of the crime of housebreaking. The details of the indictment and the facts of the case may be read in the former opinion of this court in Blair v. Commonwealth, 171 Ky. 319. The gist of the case is that Blair and Crump broke into the blacksmith shop of Smith and stole a sledge hammer and a hand axe therefrom, which they were caught using the same night in an attempt to break into the store of Cameron & Acre.

Upon the first appeal the judgment of conviction was reversed for error in admitting testimony as to the trailing of the accused by bloodhounds, and because of the incompetency of the proof of the two former convictions of the appellant. Upon a second trial appellant was again found guilty and given a life sentence in the penitentiary.

1. It is again insisted by appellant that there was not sufficient evidence to sustain the verdict, and that a peremptory instruction to find the appellant not guilty should have been given. This question was carefully considered on the former appeal, the court saying:

"We think the evidence sufficient to have required the submission of the case to the jury. The identification by Dr. Bard of Blair and Crump as the persons he saw attempting to break into the store and their possession and use in such attempt of the sledge hammer that had been taken from the blacksmith shop when that building was forcibly broken and entered the night before, together with the muddy condition of the alley, the tracks therein and the mud on their shoes, were circumstances tending to establish their guilt of the shop breaking, for which reasons the jury had the right to consider them in determining the question of appellant's guilt. We are convinced, therefore, that appellant's complaint of the refusal of the trial court to grant

a peremptory instruction directing his acquittal is without merit.''

While it is true that Crump and Barnes testified on the first trial and did not testify upon the second trial, their evidence was not relied upon in the extract above taken from the former opinion in determining that the case should have gone to the jury. The identification of Blair by Dr. Bard and the incriminating circumstances above recited were all shown upon the second trial. The proof being substantially the same upon the second trial, the former opinion is the law of the case.

It is also true that the testimony of Dr. Bard has been severely criticised upon this appeal; but the weight to be given to his testimony was properly left to the jury. This court will not reverse a case because the jury believed one witness rather than another. May v. Commonwealth, 164 Ky. 109; Cavanaugh v. Commonwealth, 172 Ky. 799; Keefe v. Commonwealth, 175 Ky. 51.

2.   It is next insisted that the court should have sustained appellant's objection to the testimony relating to the trailing of Blair and Crum by two bloodhounds immediately after the offense was committed.  The former opinion reiterated the rule upon that subject first announced in this state in 1898 in Pedigo v. Commonwealth, 103 Ky. 41, 42 L. R. A. 432, 82 A. S. R. 566, holding such testimony to be competent when properly guarded.  The rule may now be said to be thoroughly established in this jurisdiction.  Denham v. Commonwealth, 119 Ky. 508; Sprouse v. Commonwealth, 132 Ky. 269.  And it cannot be said that the doctrine is wholly a novel one.

If we may credit Sir Walter Scott, such evidence was looked upon with favor as early as the twelfth century.  In ''The Talisman'' it is related that in the joint crusade of Richard I of England and Philip II of France, Roswell, the hound, pulled from the saddle Conrade, Marquis of Montserrat, thus mutely accusing him of the theft of the banner of England.  Philip defended the marquis with the remark, ''Surely the word of a knight and a prince should bear him out against the barking of a cur.''  To which Richard replied, ''Royal brother, recollect that the Almighty, who gave the dog to be companion of our pleasures and our toils, both invested him with a nature noble and incapable of deceit.  He forgets neither friend nor foe—remembers, and

with accuracy, both benefit and injury. He has a share of man's intelligence, but no share of man's falsehood. You may bribe a soldier to slay a man with his sword, or a witness to take life by false accusation; but you cannot make a hound tear his benefactor; he is the friend of man save when man justly incurs his enmity. Dress yonder marquis in what peacock robes you will, disguise his appearance, alter his complexion with drugs, and washes, and hide himself amidst a hundred men, I will yet pawn my sceptre that the hound detects him, and expresses his resentment, as you have this day beheld." The doctrine of the admissibility of bloodhound evidence in criminal prosecutions has been slowly gaining ground during the past twenty years. See Hoge v. State (1893), 98 Ala. 10, 39 Am. St. R. 17; Parker v. State, Tex. Cr. App. (1904), 80 S. W. 1008; State v. Dickerson (Ohio 1907) 82 N. E. 969, 13 L. R. A. (N. S.) 341; State v. Hunter (N. C. 1907), 56 S. E. 547; State v. Freeman (1908), 146 N. C. 615; Spears v. State (Miss. 1908), 46 So. 166.

The general rules deducible from these decisions are as follows:

(1) The bloodhound in question must be shown to have been trained to follow human beings by their tracks and to have been tested as to its accuracy in trailing upon one or more occasions; and,

(2) The evidence of the acts of bloodhounds in following a trail may be received merely as circumstantial or corroborative evidence against a person towards whom other circumstances point as being guilty of the commission of the crime charged.

The admission of this class of evidence is therefore hedged about with abundant safeguards in the way of other and human testimony, and, as long as these rules are adhered to bloodhound evidence is no more dangerous than any other class of circumstantial evidence.

In Kentucky it is settled that testimony as to trailing by bloodhounds of one charged with crime, may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime only after it has been shown by some one having personal knowledge of the facts (a) that the dog in question is of pure blood and of a stock characterized by acuteness of scent and power of discrimination; (b) is itself possessed of these qualities and has been trained or tested in the tracking of human

beings; and, (c) that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted, at the point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated had been made by him.

But, upon the first appeal of this case this court held that the testimony upon this point was improperly admitted, saying:

"It will be observed that the testimony gives no information as to the pedigree of the dogs. It is true the witness also said they were bloodhounds, but whether they were thoroughbred bloodhounds or of such strain or breeding as are characterized by acuteness of scent and power of discrimination and by reason thereof customarily trained for use and used in trailing persons, was not stated by the witness, and the general statement of the witness that one of the dogs had been used for trailing all his life and both had been trained by Simpson, does not show that he had personally known of their being used for trailing a person at any time or that Simpson was an expert in the training of bloodhounds for such purpose."

Upon the second trial Pigue, the owner of the dogs, "Hooligan" and "Jim," testified that one was about three years old and the other about nine years old; that he obtained "Hooligan" from a Mr. Simpson, at Dyersburg, Tennessee, and "Jim" from Lexington, Kentucky; that both were bloodhounds; that "Hooligan" was a thoroughbred bloodhound, but was not registered, and that "Jim" was entitled to be registered but had never been registered; that they had no pedigree; that they had been bred for the special purpose of trailing human beings; that he had so trained them regularly; that they would trail a human being and tree him. and could distinguish the difference between the tracks of a human being and other tracks; that he had made test trials by sending a man out and have him make a run through town and at different places and by then putting these dogs on his trail, and that they would trail the man every time and tree him; that he had made several test trials with them and that they trailed the man every time.

Pigue further testified that he had had twelve or fourteen years' experience in working with bloodhounds; that Simpson, of Dyersburg, the former owner of

"Hooligan," had had a lifetime experience in the business, and was an experienced man with dogs of this kind, although it does not appear that he had ever trained "Hooligan" before he sold him to Pigue.

Pigue also testified as to the way which bloodhounds and his hounds worked by saying that they trailed a man very much like the ordinary rabbit hound trails a rabbit, only they did not bark as much on the trail as a rabbit hound; that they usually barked a few times when they first struck the trail, but after that they would go along very quietly and seldom bark after they started, except immediately after they struck the trail, and that they could discriminate between tracks of different persons. He further testified that he knew nothing of the training of his dogs before he bought them.

The testimony as to the work of the dogs upon this occasion comes well within the requirements of the rule since it appears that they were promptly put upon the trail in the rear of the Cameron & Acre store and followed the trail directly to the home of Blair and Crump.

Considering the fact that "Hooligan" was a thoroughbred bloodhound, though not registered, and that "Jim" was a bloodhound entitled to registry, and that both had been trained and tested many times with successful results, we are of the opinion this proof comes within the rule laid down in the Pedigo case and that the court properly admitted it.

It is true these dogs had no pedigree; but a pedigree is not indispensable. The rule upon this point is stated in Chamberlayne's "Modern Law of Evidence," sec. 1760, as follows:

"The pedigree of bloodhounds used in tracking criminals need not be shown as a fact preliminary to receiving evidence of their having run down a particular individual. It is sufficient if they have been shown by previous experience to be capable of doing the work required. This must be affirmatively shown. Suitable precautions must be taken to see that the animals have the true scent of the offenders, in no way confused with that of other persons."

It will be observed that the Commonwealth did not rely upon this testimony alone to convict Blair, but used it only as corroborative of the testimony of Dr. Bard, who testified that he recognized Blair while he was attempting to break into the Cameron & Acre store.

3. When the verdict of the jury was returned and received by the court and read publicly, the jury was discharged and the defendant was remanded to jail. Immediately thereafter the jury that tried Blair's case was impaneled and sworn to try another case and was actually engaged in that trial when the clerk called the attention of the circuit judge to the fact that the verdict in Blair's case had not been signed by any one. When this fact was discovered neither Blair nor his attorney was present in court. The circuit judge, however, permitted R. C. Boston, who was a member of the jury and who had returned the verdict in Blair's case to the clerk, to sign the verdict; and the court immediately ordered Blair to be brought from the jail, which was done, to all of which Blair's attorney, who had just returned to the court room, objected and excepted. After Blair had been brought into the court room Boston, the juror who had signed the verdict, when asked if he had signed the verdict said that he had, and the jury was then polled and asked if it was their verdict. Each member of the jury answered affirmatively, and the jury was finally discharged. To all of this Blair again objected and excepted.

Section 267 of the Criminal Code provides for the polling of the jury and confers the right to have the jury polled upon both the accused and the Commonwealth. In this case the jury had been discharged upon the return of the verdict, although none of the twelve was ever out of the presence of the court until after the verdict had been signed, and no objection was taken by appellant to the verdict at the time it was returned.

Ordinarily, when a defendant allows a jury to be discharged without objection and without motion to have them correct or extend their verdict, he will be deemed to have waived the formal defects in the verdict, and it must then affirmatively appear that the substantial rights of the accused have been prejudiced by the informality. The presumption will not be indulged that his rights were prejudiced. Gilliam v. Commonwealth, 121 S. W. 445; Williams v. Commonwealth, 140 Ky. 34.

In Taggart v. Commonwealth, 104 Ky. 301, the jury inadvertently used the word "punishment" in writing their verdict in place of the word "penitentiary." After the verdict was read, the jury was discharged and all of the members took their seats in the court room save one, who entered a water closet adjoining the court room. The

attention of the court having been called to the mistake in the verdict, the members of the jury were recalled and the court corrected the verdict by substituting the word "penitentiary" for "punishment." The verdict was then read to the jury and the jury polled. On appeal it was held that this proceeding in the circuit court did not prejudice the rights of the defendant.

In Denham v. Commonwealth, 119 Ky. 508, it was complained that after the jury had returned its verdict and had been discharged they were recalled by the court and sent to their room to return a corrected verdict. The court, however, found that the jury had not been discharged until after the return of the corrected verdict. In that connection, however, it said:

"But if the jury had been discharged, as charged by counsel for appellant, even then, as they had not left the presence of the court before being recalled and directed to retire to their room for the purpose of returning the second verdict, no injury could have resulted to appellant's rights."

Under the circumstances it is apparent the appellant was in no way prejudiced by the correction of the verdict in this case.

4. It is also complained that the trial court improperly admitted the evidence concerning the former convictions of appellant. This question was before the court upon the former appeal in this case and the complaint now made was then made and was sustained, because the clerk of the Hickman circuit court was permitted to testify concerning these former convictions without having the records before him.

But in holding that to be erroneous, the court laid down the rule upon this subject and said that a former conviction of a felony must be shown by the introduction in evidence of the indictment, verdict, judgment and sentence of the former trial, or certified copies thereof. The rule as thus stated was strictly followed upon the last trial.

In this connection it is further contended that the records concerning the former convictions of appellant were not read to the jury. This record, however, shows that the old records were read to the jury and that following their introduction the defendant moved the court to exclude them from the jury.

5. It is insisted that before Blair could be convicted under section 1130 of the Kentucky Statutes and confined in the penitentiary for his natural life, he must theretofore have been convicted of the offense of housebreaking—the same offense for which he was finally convicted. We are not impressed by the soundness of this legal proposition.

Section 1130 of the Kentucky Statutes reads as follows:

"Every person convicted a second time of felony, the punishment of which is confinement in the penitentiary, shall be confined in the penitentiary not less than double the time of the first conviction; and if convicted a third time of felony, he shall be confined in the penitentiary during his life. Judgment in such cases shall not be given for the increased penalty, unless the jury shall find, from the record and other competent evidence, the fact of former convictions for felony committed by the prisoner, in or out of this state."

The proof shows that Blair was convicted in the Hickman circuit court in 1905 for housebreaking, and served a term of two years in the penitentiary for that offense; that in 1908 he was again convicted in the Hickman circuit court upon the charge of incest, of which he admitted his guilt, and served a term of five years therefor in the penitentiary.

It will be observed that the statute does not require that the accused must have been convicted of the same character of offense as that for which he was subsequently convicted. It merely provides if he has been convicted of a *felony* he may, upon a subsequent conviction of a felony, have his term extended, as provided in the statute. Lucas v. Commonwealth, 142 Ky. 416; McIntyre v. Commonwealth, 154 Ky. 149.

6. It is next complained that the trial court abused its discretion in refusing to grant the appellant a continuance on account of absent witnesses. Appellant filed his affidavit in support of his motion for a continuance showing what the absent witnesses would say if present, and these affidavits were read to the jury as the depositions of the absent witnesses. The greater portion of them impeached the evidence of Dr. Bard, alleging he had made upon the examining trial certain statements concerning the identification of Crump and Blair that

were in conflict with his statements in that respect upon the last trial. The granting of a continuance is largely left to the sound discretion of the trial court, and unless that discretion is abused this court will not interfere. Belcher v. Commonwealth, 165 Ky. 649; Douthitt v. Commonwealth, 179 Ky. 192. It was not abused in this instance.

7. Finally, it is contended that there was no evidence under which the second instruction could have been justified. This instruction followed the indictment, which also charged Blair with being an abettor and permitted the jury to find Blair guilty if they believed from the evidence that he was aiding and abetting Crump in the commission of this crime. It is shown that Blair and Crump were living together in the same house where they were found immediately after the crime was committed; that their shoes were muddy, thus tending to show that they had been together that night, and Dr. Bard testified that he recognized Blair, who was standing near and assisting Crump while he was prizing open the door of the Acre house. Moreover, these instructions were substantially the same as those given upon the former trial, to which this court took no exception. On the contrary, it called attention to the fact that upon that appeal appellant's only objection to the instructions was that the testimony was insufficient to take the case to the jury.

It appearing from a full consideration of the case that appellant has had a fair trial, the judgment of the circuit court is affirmed.