## Hall v. Commonwealth.

(Decided June 13, 1912.)

### Appeal from Pendleton Circuit Court.

Homicide—Verdict of Guilty—Sufficiency of Evidence.—On a prosecution for homicide, evidence examined and held insufficient to sustain a verdict of guilty.

JOHN H. BARKER, J. T. SIMON for appellant.

JAMES GARNETT, Attorney General, CHAS. H. MORRIS, Assistant Attorney General for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Appellant, L. D. Hall, was indicted by the grand jury of Pendleton County for the murder of Elijah Wood. He was tried and convicted of voluntary manslaughter, and given an indeterminate sentence of from two to twenty-one years in the State penitentiary. From the judgment predicated on the verdict this appeal is prosecuted.

The chief ground relied upon for reversal is that the evidence is not sufficient to sustain the verdict.

The evidence shows that Elijah Wood, the man who it is claimed appellant killed, lived in Pendleton County, near the Harrison County line. On Monday, September 25, 1911, he came to Falmouth driving a horse and buggy. He left his horse and buggy at a livery stable. He was last seen about dark, going in the direction of the place where his body was found. On Saturday, September 30th his body was found on what is known as the Klee place, at a point about 100 yards from the Cynthiana pike, and

about a mile from the town of Falmouth. Near his body was found a storm apron from a buggy, and at another place a watch, which was afterwards identified as belonging to deceased. About ten steps away was found an ordinary pick, but no blood was discovered upon it. There were two holes in the head of deceased, indicating that he had been struck by some sharp instrument, and his body was badly decomposed. Blood was found on the storm curtain, and also on a knife taken from the pocket of deceased. No money was found on deceased.

The evidence by which it is sought to connect appellant with the crime is as follows:

Appellant was at Wood's home on two occasions some few days before the latter disappeared. Verney Baker, who was on a visit to Wood's home, testifies that on September 15th appellant took dinner with Wood. While Wood and appellant were in the barn, she went to the barn and stood on the outside. There was a plank off the barn, and while there she heard appellant say if Wood would give him $500 good money, appellant would give him $2,000 greenbacks. Wood said he could not pass the money; whereupon, appellant said that he would pass it. Witness stood there for a long time, but this is all the conversation she remembered.

Between 4:30 and 5:30 o'clock of the afternoon of September 25th, three witnesses claim to have seen appellant and Wood go on the Main Licking bridge. About 6 o'clock, Wood was seen in front of a hotel in Falmouth by Dan Daugherty. The same witness saw him about 7 o'clock going toward the Klee place. Robert Pugh and wife, who live at the toll gate, saw a thick, heavy-set man going out the Cynthiana pike about 7 o'clock. About 200 yards behind him there was a tall, slim man. The man in front had a bundle under his arm. These witnesses all saw John Zempter pass behind the two men, and Zempter testifies that he saw the man in front about dark going out the pike, but did not see any one behind him. Otis Mains and Nannie Ayers testified that they saw appellant going in the direction of the Cynthiana pike about 7 o'clock. Mrs. John Austin says that she was at appellant's house some time between 7 and 8 o'clock, until about 9 o'clock, and appellant was not at home. On Tuesday morning, September 26th, appellant went into the store of William Gillispie and purchased from him a pair of trousers, some house slippers and a pair of suspenders. The amount of the purchase was $4.60 or

$4.70. Appellant tendered a $5 bill in payment. According to these witnesses and to Harry Spradling, who also saw the appellant about 6 o'clock on the morning of the 26th, the bottom of appellant's trousers and his shoes were muddy. One witness saw appellant purchase a bottle of hoptina in Falmouth on Wednesday morning between 8 and 10 o'clock, and tender a $20 bill in payment. Another witness saw appellant at the fair, which was then going on, with $10, which appellant told him he was going to put up on a race. Another witness claims to have seen appellant buy a hamburger on Friday, September 29th with a $10 bill, and another hamburger on Saturday the 30th, with a $10 bill. Two witnesses claim to have seen Hall standing in his kitchen door about 6 o'clock on Tuesday morning, and to have seen smoke in the back yard which smelt like something burning. Two or three witnesses testify that appellant was never known to work. Mrs. Louisa Williams, from whom appellant formerly rented, testified that he did not pay his rent up to the preceding April, because he said he was out of work and had no money. Charles Weaver claims to have seen Hall buy hoptina at the Falmouth fair three times on Wednesday, September 27th. The first time he tendered a $5 bill in payment, and on each of the other two times, he tendered a $1 bill in payment.

Appellant left for Cincinnati on the 10 o'clock train Tuesday morning. He met Frank Pfanstil in Covington Tuesday night, and they spent the night together in the same room. Pfanstil says that Hall exhibited to him some money in bills, and showed him a note for $800, and said he was going to Knoxville, Tennessee. Appellant returned to Falmouth Wednesday morning on the 8:08 train. R. C. Diltz, city marshal of Falmouth, says that he saw appellant get off the train. Appellant was alone, and carried a suit case. In answer to the question as to what passed between them, witness said: "I asked him if he was getting back and he said yes. And then he asked me if they had found Lige Wood, and I said no." Prior to that time appellant had not said anything to him about Wood. The same witness testifies to having gone to appellant's house with a search warrant. He found a pair of shoes and a pair of trousers. The shoes had been washed. There were streaks of mud on them. Neither the shoes nor the trousers were concealed. Witness had no difficulty in finding them.

Lewis Hamilton, a neighbor of Wood, came to town on Wednesday to look for him. He drove up to appellant's house and asked appellant if he had seen Wood or knew anything about him. Appellant replied that he had seen Wood on the wooden bridge Monday. At the time he saw Wood, Wood was going over to Mr. Oldham's to buy some sheep and hogs. Appellant said he thought Wood would turn up all right. On Friday he met appellant, and appellant told him that Wood was off with a base woman, and would show up.

W. A. Wood, a kinsman of deceased, testifies that he met appellant on Wednesday afternoon. Appellant said: "There is no use being anxious about Wood, as he will probably come in on the afternoon train." Appellant went to the afternoon train for the purpose of meeting Wood. He came back and said Wood would come in on the five or nine train. Appellant remarked that Wood was a queer fellow.

The cashier of the Pendleton County Bank testifies that Wood negotiated a note with the bank on September 4th. The face of the note was about $100, and Wood got about $96 in cash.

Kate Hardin, who worked for deceased, testifies that when deceased left on Monday, he had some bills of small denomination. John Fogle saw deceased on Friday before the fair. Deceased had some money. Deceased owed witness $5.50, and was undertaking to pay him, but could not make the change.

The evidence for the defense is as follows:

Appellant testifies that he had been out at Wood's house for the purpose of purchasing a horse from him. Wood wanted $200 for the horse, but appellant was willing to give him, and offered him, only $125. In this statement he was corroborated by John Fogle, who was present on the occasion of appellant's visit to Wood's home. Appellant denies having had the conversation with Wood in reference to furnishing him $2,000 in greenbacks for $500 in cash. Fogle, who was nearby, also testifies that he never saw any woman go near the barn that day. Appellant admits that he was with Wood on the covered bridge between 4:30 and 5:30 o'clock in the afternoon. Appellant had been over to the mill and was coming back. Wood asked him if Jesse Oldham was at home. Appellant told him that he had seen Oldham at the fair ground. They then walked together a part of the way through

the bridge, when Wood said he was in a hurry, and went on. A few minutes later appellant returned to town. He stopped at Galloway's stable and Frank Bell's, and at the butcher shop. When he neared his home, a little girl met him with a request from his wife to go back and get a loaf of bread. He went back and got the loaf of bread and returned home to his supper. After supper he talked to and played with his baby for a few minutes while his wife was washing the dishes. About ten or fifteen minutes after 7 o'clock he went to his brother Jake's in the eastern part of the town. On the way he met Frank Bell at Abraham's corner, Browning on the bridge, and Mains, one of the Commonwealth's witnesses, a little further on. His brother had been sick, and when he reached his home he found the house dark, and did not go in and disturb him. He came back the same way he had gone. In this statement he is corroborated by his brother, who was ill at the time, and was lying in bed. His brother says that he heard a noise at the gate, and upon looking up he saw appellant going out of the gate. Appellant further says that he got to the station about 8 o'clock or a little later, and went to the window and talked to Fisher, the operator. He remained at the station until the fast line went through, which was about 9:30. He saw Frank Bell and one or two others at the station. He and Bell left the station together and walked to the corner, when he turned off to go home, and did go home. When he reached home, his wife was just retiring. There was no one there except his wife and baby. He spent the night at home and got up about 5:30 for the day, and went to Fossett's store and bought some articles of clothing. He went to Cincinnati that morning on the 10 o'clock train, and came back the next morning on the 8 o'clock train. He had intended returning the same night, but met an acquaintance in Covington, and remained with him all night. He went to Covington to meet a man in regard to a horse trade. He didn't go to the fair on Wednesday, but went Thursday, and was there Friday afternoon and Saturday. The money that he spent at the fair, and the money that he went to Cincinnati on, was his own that he had brought with him to Falmouth. When he came to Falmouth he had six or seven hundred dollars. While in Falmouth he worked in a warehouse some; was also engaged in stripping tobacco. The reason he left his

former house was that the landlady wanted to raise the rent because he rented one of the rooms to a boarder. He thinks he had altogether about $65. After he left Wood on the covered bridge, he never saw anything more of him. When he went to Cincinnati, he had only a small hand bag. Never had a suit case. When he returned, he met Diltz, the marshal, but did not have with him the conversation which that witness detailed; on the contrary, Diltz asked him if he had the mate to the cigar which he was smoking, and he replied that he did not. On cross-examination, it developed that appellant had traveled over the country a great deal, and for a while was engaged in buying horses for a man in Hamburg. He detailed several instances where he had bought and sold horses and made money on them. He married about two years before the murder, and his wife had a half interest in a small farm. He rented the other half, and made some money raising tobacco. He also made money trading in horses, and this is the money he had when he came to Falmouth. He always paid cash for everything. He admits having seen Hamilton on Wednesday, and having gone to the train to see if Wood came in on the train.

Frank Bell testifies in substance that he had known appellant for four or five years. He was in town on Monday afternoon, and saw appellant at Galloway's stable about 4 o'clock. He saw appellant about 7 or 7:30 at Abraham's corner, and talked with him, on Monday evening. At that time witness was on his way to see his present wife, who lived out near the station. He went walking with his wife; about 9 o'clock he returned to the station and saw appellant. Appellant gave him a chew of tobacco. They walked up town together; he went on his way, and appellant left in the direction of his home. This was about 9 o'clock. Witness heard that Wood was missing on Tuesday morning. Appellant at the time was wearing a light shirt with a stripe in it, and was in his shirt sleeves. A man by the name of Conners testifies that he saw appellant Monday night at the depot with Frank Bell; he thinks about 8:15 o'clock. Jeff Triplett testifies that Hall frequently came into his soft drink establishment and bought drinks. Mrs. Smith testifies that she and Hall were neighbors; that about 6 o'clock Monday afernoon she saw him; he had his baby in his arms and was standing outside of the door. She

got up at 4 o'clock the next morning, but did not see or smell any smoke. Fred Fisher, the operator, testifies that he was at the station, and acted as operator, on Monday night. Appellant was there, and talked to him, three nights in succession; they were either Friday, Saturday and Sunday, or Saturday, Sunday and Monday nights.

The evidence further shows that appellant lived west of the court house near the railroad station, while the body of Wood was found about a mile east of the court house in the opposite direction.

It will be observed from the testimony that appellant was seen with Wood on the covered bridge between 4:30 and 5:30. Hall admits this himself, but explains the circumstances under which he met Wood, and that Wood then returned to town. It is also conclusively shown that after that time Wood was seen in the town between 6 and 7 o'clock, and that he was alone. It also appears that Wood left town and was alone when he proceeded in the direction of the Klee place. Why Wood left his horse and buggy in town and walked to the country with the apron curtain under his arm does not satisfactorily appear; nor is there any evidence that Hall actually went out the Cynthiana pike. There is the evidence of two witnesses that he was going in that direction. He explains this by saying that he was going to his brother's, who, it is shown, also lived in that direction. In this statement, he is fully corroborated by his brother, who says he was at his house about 8 o'clock. A short time after that, Hall was seen down town. Later on he returned to his home. This is not a case, therefore, where the evidence shows with any reasonable degree of certainty that the deceased was last seen with appellant. It was not shown that blood was on any article of clothing that appellant wore. The circumstance that the bottom of appellant's trousers and shoes were muddy is entitled to but little weight. It is shown that he was walking out the road and through the streets, and the mud may have gotten on his trousers and shoes in this way as well as by going into a field. The evidence tends to show that appellant did have some money. Even if he did not work, as claimed by witnesses for the Commonwealth, he must have had something to live on, for, as far as this record discloses, he always paid cash for everything he bought. Appellant fully explains why he made his trip to Cincinnati, and why he purchased additional clothing to make

the trip with. He did not attempt to run away, but returned to Falmouth, and was at the fair every day. If we leave out the statement which the city marshal claims appellant made to him on his return from Cincinnati, there is scarcely a circumstance in the case pointing to appellant's guilt. If appellant's statement to the marshal is remarkable in that he did not know as a matter of fact that Wood had been killed, it is also true that the marshal's reply to the effect that Wood had not been found, was somewhat remarkable, in that the marshal himself did not know of this fact.

Under the facts in this case, if guilty at all, appellant was guilty of cold-blooded murder, perpetrated for the purpose of robbery. The jury, however, found him guilty only of manslaughter. The verdict itself is, therefore, evidence of the doubt that existed in the minds of the jury. In view of the peculiar verdict of the jury, and the unsatisfactory character of the evidence tending to connect appellant with the crime, we are not disposed to uphold the verdict. In a case like this, where the evidence is purely circumstantial, the circumstances should point more unerringly to the guilt of the accused. Where, upon consideration of all the facts, the mind is left in such doubt as we entertain in this case, we naturally feel considerable hesitation in affirming a verdict of conviction, where, even under the admitted facts, it is not at all improbable that the crime may have been committed by some one else.

Judgment reversed, and cause remanded, with directions to give appellant a new trial.