## Miller v. Commonwealth.

(Decided November 15, 1929.)

528

JOHN ROSE, F. W. WHEELER, W. C. GIBBONS and E. L. VASS for appellant.

J. W. CAMMACK, Attorney General; S H. BROWN, Assistant Attorney General; E. W. CREAL and BUFORD LARIMORE for appellee.

OPINION OF THE COURT BY COMMISSIONER TINSLEY—
Affirming.

Under an indictment in three counts (1) charging the appellant alone with the murder of Lula Kirchner; (2) charging him with entering into a conspiracy with Will Farris to murder Lula Kirchner, and that pursuant thereto and whilst the same existed he did so do; (3) that one or the other of them murdered LulaKirchner, and that the other of them was present and aided, abetted, and assisted the one so doing, the appellant was convicted, and his punishment fixed at confinement in the penitentiary for life. In view of the grounds urged for a reversal, a somewhat lengthy and detailed statement of the testimony is made necessary.

Will Farris, with whom it is charged in the indictment appellant conspired to kill and murder Lula Kirchner, was a native of Hart county, Ky.; but for about 20 years prior to the death of Lula Kirchner he had resided in the city of Cincinnati, Ohio, where he was a denizen of its underworld. Some years prior to the death of Miss Kirchner, he went to board at the home of a Mrs. Weis, who resided near to the home of Miss Kirchner in Cincinnati, and shortly thereafter he became acquainted with the latter. As time went on, there developed between them an intimate friendship, if not relations of a more amorous nature, and these relations had existed for about 5 years prior to her death. It is shown, however, that during all of this time he called at her home only once, and thereafter their meetings were had elsewhere, and were more or less clandestine.

The latter part of July, 1928, Will Farris went to the home of his mother, Mrs. Nora Farris, in Hart county, Ky. About that time Lula Kirchner informed her family that she contemplated a visit to Hicksville, Ohio, to see about taking up some sort of work there. On August 17th, following, she informed them she would go to Hicksville the next day, but at the same time she told a friend and neighbor, a Mrs. Englehart, that she was going to Mammoth Cave, Ky., to meet Will Farris and to marry him. However, she requested Mrs. Englehart to keep the matter secret for a few days, saying to her that she was confiding in her so that, in event her mother, who was an invalid, grew worse, Mrs. Englehart would know where she could be reached. She left Cincinnati on August 18th, on Louisville & Nashville train No. 7 at 11 o'clock.

Between 12 and 1 o'clock on that day Will Farris borrowed from his sister, Mildred Martin, her horse and buggy, a lantern and a feed sack, saying to her he was going over into another section of the country to procure some whisky, as he intended to return to Cincinnati the next day, and that he would not get back until late that night. Instead, however, he drove to Mammoth Cave, where he met Lula Kirchner, as she alighted from the train, about 6:30 o'clock p. m. He was seen on the road traveling in that direction by two witnesses, and had with him a black-jack and a pistol, and it seemed to these witnesses he was under influence of liquor. He was seen by other witnesses to meet Lula Kirchner, as she got off the train, and to put her in the buggy, and start in the direction of the place where her body was subsequently found. This is the last time she was seen alive.

About midnight of August 18th, Will Farris returned to the home of his sister, Mildred Martin, with her horse and buggy. She got up, and prepared him something to eat. There had been a heavy storm, and rain between dark and midnight. His clothing was muddy, and he accounted to her for that condition by saying the buggy turned over with him. He spent the remainder of the night at his sister's home, but went to the home of his mother early next morning, and shortly thereafter, on the same day, returned to Cincinnati.

About 5 years prior to the death of Lula Kirchner, appellant became acquainted with Mildred Martin, sister to Will Farris, and shortly thereafter their relations be-

came so intimate that she was, in fact, his mistress, and one is led, from the record, to believe his visits to her were of almost daily occurrence. On the morning of August 17th (the day Lula Kirchner left Cincinnati to go to Mammoth Cave), he made his customary visit to the home of Mrs. Martin. Upon arriving there, he learned from Mrs. Martin that her brother, Will Farris, would take her horse and buggy some time that morning, and go for whisky to take back to Cincinnati, and he said she advised him to go away and hide out until after Farris had gone; that he did this, and returned about 1 o'clock and spent the afternoon with her; that she told him her husband and brother, Beckham Farris, would be gone the next day (Saturday), and for him to return then.

About 5 o'clock on Saturday morning, August 18th, it is shown that appellant bought some lemons and oranges at a store in Horse Cave, and about 5:15 o'clock got on an ice truck, and rode on it to a point near to and from which he could cut across the field to Mrs. Martin's house. He also bought 50 pounds of ice from the man in charge of the truck. Between 6 and 7 o'clock he went to the top of a small hill, or rise, from which he could see the Martin residence. He says he saw Mrs. Martin's husband engaged in some chores about the barn, and saw Will Farris tinkering about or rubbing off the buggy, and presently saw Mrs. Martin's husband, Garland Martin, and her brother, Beckham Farris, leave, and a few minutes later saw Will Farris go down into a gully back of the house and near the barn, and cut some small brushes and throw them into the gully; that he surmised from these actions that Will Farris was hiding the whisky Mrs. Martin told him Farris went after the day before. Shortly thereafter, he says, Will Farris left, going in the direction of his mother's home. He then went to the house, and only Mrs. Martin and her little girl were there. After a while he asked Mrs. Martin if Will Farris brought any liquor the day before, and was answered in the negative. He went to the gully where he thought Farris had hidden the liquor. He found the place, but did not find any liquor. He says, however, that he found five lady's slippers, which he threw upon the bank of the gully by the side of the Martins' woodpile, and then returned to the house and told Mrs. Martin about the slippers, and that her little girl went and brought them to the house.

On Sunday afternoon, the 19th, appellant again went to the Martin residence, took a mess of fish he had caught earlier in the day, and stayed until time for milking the cows and doing the other work about the farm, and assisted Garland Martin in doing this work. He says on their way from the barn back to the house Garland Martin found a suitcase, which was locked, but which had one side cut out of it, and that appellant found another slipper. He and the Martins talked about the suitcase and slippers, and speculated as to how they came to be there, finally concluding that, as a number of robberies had been committed in the neighborhood recently, the suitcase and slippers had been thrown there by robbers.

About a week later the family of Lula Kirchner became worried because of her continued absence, and not having heard from her. They talked with their neighbors about her absence, and then Mrs. Englehart told them that Lula had told her she was going to Mammoth Cave to meet and marry Will Farris. Her sister, Clara Kirchner, then sought and found Will Farris. She testified that she made inquiries of him concerning her sister. He told her that Lula had told him that she was going to Hicksville, Ohio, to see about a position. Then Clara told him that Mrs. Englehart had told her that Lula had said she was going to Mammoth Cave, Ky., to meet him and to marry him. Clara Kirchner said this information staggered Will Farris; that he became exceedingly nervous, the sweat popped out all over his face, and he glanced furtively up and down the street, but denied any knowledge of Lula's whereabouts, or that he had seen her at Mammoth Cave.

Clara Kirchner further testified that a few days later her family received two letters, one from Nashville, Tenn., and the other from Hamilton, Ohio, signed "Mr. and Mrs. Shawl," stating that Lula was with them, was having a good time, and was married and on her honeymoon. She testified, however, that the family knew no person named Shawl. It is shown that on August 24th Will Farris caused to be written by his nephew, George Short, a letter to his mother, Mrs. Nora Farris, asking her, in substance, to write him to the effect that a Miss Lula Kirchner had never been at the Farris home, stating to his mother as a reason for this that some people were making inquiries concerning Miss Kirchner, and he wished to show her letter to them. The testi-

mony shows that Mrs. Farris discussed this letter with her son Beckham.

A few days before this letter was received by Mrs. Farris, appellant, while on another visit to the Martin home, found a sack of women's clothing in the gully where he had previously found the slippers. He says Mrs. Martin was with him at the time, and that he carried the clothes to her home, emptied them on her porch in the presence of Mrs. Martin and a colored woman named Hattie Wilson, and that Mrs. Martin took some stockings and other articles, and that he took the remainder to his home, and that his wife washed them and made some of them over for their young daughter. Mrs. Martin and Hattie Wilson denied that any such thing occurred.

Appellant further testified that a few days later, a Mrs. Short, a sister of Will Farris, with her daughter and son and one Robert Farris, came down from Dayton, Ohio, to visit her mother. Appellant was on one of his customary visits to Mrs. Martin. He says he saw Mrs. Short and other members of her family walking about over the Farris farm apparently looking for something, and that Mrs. Short was crying; that he asked Mrs. Martin about it, and that she replied that her brother Will was in some trouble in Cincinnati. He further testified that, after Mrs. Short and her family left, he suggested to Mrs. Martin that they go over the fields and see if they could find anything, and in the course of whic hthey found a letter, torn into bits, and which Mrs. Martin undertook to fit together, without success. Mrs. Martin denied this. Appellant says he took the bits of paper home with him, and that his wife fitted them together, and it was a letter addressed to Miss Lula Kirchner, 133 Mulberry street, Cincinnati, Ohio. He says he then had his wife gather up all the clothes he had found in the gully back of the Martin residence and wrapped them up, and told her not to let their daughter wear any of them again; and that the next day he went to see Mrs. Martin again, and told her that his wife had succeeded in fitting together the pieces of paper they had found the day before, and that it was a letter addressed to Lula Kirchner, and that he believed her brother Will had murdered a woman by that name, and that the suitcase, clothing, and shoes they had found belonged to the woman, and that he further believed Will

Farris had buried the body near by, and suggested that they continue to search for it. He says that in the course of their search Mrs. Martin said to him, "If this is true, if the body is ever found, it will be naked," and that when he asked, "Why?" she answered, "Because Will would be too smart to bury a woman with her clother on. He once read a book about Pearl Bryan. She was identified by her clothes." Mrs. Martin denied that any of this occurred.

It is shown that some days after the finding of the pieces of paper which appellant claims he and Mrs. Martin found, and which he claims his wife succeeded in putting together, appellant and Beckham Farris, a brother of Will Farris, were engaged in conversation in Horse Cave, and in that conversation appellant said to Farris, "Beckham, do you reckon Will could be in any trouble over that woman," and that Beckham replied, "I don't know, but I am going to find out if I have to go to Cincinnati to do it." It is shown that about daybreak September 6th, Beckham went to Cincinnati, and talked with his brother, Will Farris. He returned on the 7th. Appellant says that early that day he went out to a hill, or rise, overlooking the Martin farm and vicinity, and presently he saw Beckham Farris and Garland Martin leave the place, and he followed them; that they went to an old unoccupied house called the Mansfield place, and to an outdoor room or cellar called "a potato hole;" that they opened the door to this potato hole, looked in, and presently left. He testified that a few days later he and Mrs. Martin went to the old Mansfield place to gather peaches; that, while he was knocking peaches, from the tree, Mrs. Martin opened the door to the potato hole, and that he at once went to her and said, "What is it?" and that she replied, "George, I do believe that this is where Will buried that woman." He says he wanted to get a shovel and investigate it, but that Mrs. Martin declined to do it, and that they then returned to her house. She denies this.

After reaching the house, he says he proposed to Garland Martin that they procure tools and dig into the potato hole, but that Martin declined. Martin says this did not occur. Then he says he went home and had his wife write for him a letter to the Cincinnati police asking whether Lula Kirchner was missing and whether there was any reward for her recovery, and in the letter ad-

vised the police that they would have to act quickly, as the body might be moved; that on the following morning he showed this letter to Mildred Martin, and she persuaded him not to mail it, saying: "It would get the whole Farris family in trouble." Mrs. Martin denies this.

From that time nothing seems to have developed until Friday night September 14th, at about 9 o'clock, when Will Farris appeared at the home of his mother. Appellant says he learned of Will's presence in the community next day (Saturday), but that he (appellant) kept away from the Martin home both Saturday and Sunday. It is shown, however, that Mrs. Martin and her husband and daughter spent the day, Sunday, with Lee Farris, about two miles south of Horse Cave, and returned to their home late in the afternoon. After milking and doing the other necessary chores about the place, the family went to the home of Mrs. Martin's mother, and spent the night. She and her husband both testified that, when they reached home in the late afternoon, they found their house had been broken into, and a shotgun belonging to Mr. Martin had been taken, and they were afraid to stay there. About dark that Sunday evening one, or maybe two, gunshots were fired about the Martin home, and a light was seen moving about the house and barn. No investigation was made at the time, but appellant says that next morning, Monday, September 17th, about 10 a. m. he went to the Martin home. Mrs. Martin was alone, washing some stockings and other articles of clothing, and went into the rear of the house to hang them out to dry, but immediately came running back, and said: "George, Will is out in the garden, either asleep or dead—You'd better get away;" that she suggested they go to the home of the colored woman, Hattie Wilson, and that, when they reached the house, Mrs. Martin said to Hattie Wilson, "Did you hear any shots last night?" and, when she replied in the negative, that Mrs. Martin said: "Oh, Hattie, Will is dead, he is down in the garden at home." The colored woman and her husband notified a number of near neighbors, and soon thereafter quite a crowd had gathered at the Martin home, where the body of Will Farris was found lying in the garden, and Martin's gun was lying across his leg. Appellant testified that he and Mildred Martin remained at the home of Hattie Wilson after the crowd had gone to the Martin home, and that she was greatly excited, and was crying;

that he said to her, "Mildred, tell me what has happened?" and that she then said, "Last night when we got home from Lee's, Garland went out to milk. My little girl and I went into the house. In a little while Will came in. He was drinking. He said, 'Mildred, God damn your soul, if you hadn't had that dirty George Miller hanging around here this never would have been found out.' He shot at me but missed. I grabbed by own shotgun and killed him in self-defense. The little girl ran to the barn and told her father what had happened. Then he and I moved him out into the garden and went up to Mother's for the night." Mrs. Martin denied that this occurred or that appellant went to Hattie Wilson's. Hattie Wilson says appellant was not at her house.

Later on that day an inquest was held over the body of Will Farris. Appellant was a witness. He disclosed in his testimony that he had a number of articles of women's clothing which he had found, stating when and where he found them. In the course of his tesimony, he stated to the magistrate holding the inquest, and to the jury, that he believed some unknown woman had been murdered in that vicinity, and that he believed Will Farris was connected with it in some way, and that he believed he could take them to where the body was buried. Afterwards he led the party to the old Mansfield place and to the "potato hole" hereinbefore referred to. This potato hole was a dugout—dug into the side of the hill, walled up, covered, having a door which opened on a level with the ground, and having a dirt floor. In the center of it there was a pit dug into the ground into which potatoes could be placed, and, when covered, were not subjected to freezes. The dirt was removed from this pit, and the body of a woman so badly decomposed as to prevent identification was found. The body was clothed in a single undergarment. The teeth were false, and were later identified by Clara Kirchner as the teeth of her sister, Lula Kirchner. The clothing which appellant testified he had found and carried to his home, and the shoes he found, were also identified as belonging to Lula Kirchner.

Shortly after the inquest, and under the testimony heard therein concerning the killing of Lula Kirchner, Mildred Martin and her husband, Garland Martin, were arrested charged with that crime. A few days later Mrs. Martin accused appellant of the crime, and he was ar-

536

rested and lodged in jail. On the trial Mrs. Martin testified that, about ten days after the date it is assumed Lula Kirchner was killed, appellant was at her home, and during a conversation between them he said to her, "Mildred, you thought Will went after whisky that day he borrowed your buggy to go to Mammoth Cave, didn't you?" and that, when she answered, "Why yes, that is what he told me," appellant replied, "Well, he didn't, he went over there to meet a woman from Cincinnati. He brought her up to the old Mansfield house and I killed her with a blackjack." She further stated that appellant told her that Will Farris had paid him $200 for doing it.

Garland Martin, husband of Mrs. Martin, testified that on Friday, before the body of Farris was found on Monday, appellant told him there was a grave at the old Mansfield house. Mrs. Martin also testified that on September 7th, just after her husband and brother had left home (the day appellant testified he followed them to the old Mansfield house and saw them look into the potato hole), appellant came to her house and accused her of having told her husband and brother what he had told her about the killing of Lula Kirchner. She denied to him having told them, and says she thought that he then went away. But some time later she says she went to the home of Hattie Wilson, and on her return about an hour later she met appellant, who again made the same accusation; that he was then armed with a pistol, and threatened to kill her for having told; that she attempted to escape from him, and that he ran after her and threw her down; that she screamed, and Hattie Wilson and the latter's husband, Lewis Wilson, came to her assistance. She is corroborated in this by these colored people and her little girl. Appellant denied this occurred. She also testified that some days later at her home appellant again accused her of having told her husband and brother, Beckham Farris, what appellant had told her concerning the death of Lula Kirchner, and that he threatened her, and ran her around her house with a butcher knife in his hand.

Against this testimony and that heretofore recited appellant testified, and was corroborated by one or more witnesses, that he was in Horse Cave on the night of August 17th, the day that Lula Kirchner left Cincinnati, and on which day about 6:30 p. m., she was met at Mammouth Cave, Ky., by Will Farris. Horse Cave is about

twenty miles from Mammoth Cave, and about seven miles and a half from the old Mansfield place where Miss Kirchner's body was found. Appellant was seen in Horse Cave about 7 o'clock that evening by Dr. Vensel, and some time earlier by Grauman Stewart, Robert Palmore, Kay Palmore, and W. C. Stewart. He proved by Andy Johnson and Nimrod Johnson that he attended a tent show in Horse Cave that night at 8:15 and by a number of witnesses that he was inside the tent until the performance was over at about 10:30. Marion Reynolds testified that he sold appellant a pack of cigarettes at about 11 o'clock, and Walter Coomer testified that on his way home about that hour he overtook appellant, and went with him to his home and spent the night there. However, it was also shown that, when testifying at the inquest over the body of Will Farris, appellant testified that he had an arrangement with Mildred Martin to meet her that night at an old cabin near her home, and, though she did not meet him, he spent that night in the cabin.

This lengthy statement of the evidence and the facts appearing therefrom has been made necessary because of the very nature of the case, and for the reason that the first ground urged for a reversal is that the verdict is contrary to the evidence. It is argued earnestly that evidence in appellant's behalf shows conclusively that he not only had no part in the killing of Lula Kirchner, but that being in Horse Cave all that night he could not possibly have had any hand in it. This contention, of course, takes no account of the testimony introduced in behalf of the commonwealth, which, it must be held, was sufficient to take the case to the jury, and, if true, or believed by the jury to be true, is sufficient to sustain the verdict. The evidence upon material points is very conflicting; and, if this court were called upon as a court of original jurisdiction to hear and determine the case upon the facts, it might reach a conclusion different from that reached by the jury. However, it has been repeatedly written by this court that the jury is the sole judge of the weight and sufficiency of the evidence, and that the court is without authority to invade its province, except when the verdict is so palpably against the evidence as to shock the conscience of the court. Jones v. Commonwealth, 230 Ky. 24, 18 S. W. (2d) 287; Owens v. Commonwealth, 230 Ky. 212, 18 S. W. (2d) 976; Gilbert v. Commonwealth, 228 Ky. 19, 14 S. W. (2d) 194. There is

no claim that the verdict is the result of passion or prejudice, and it cannot be said that it is palpably against the evidence.

2. The next ground urged for reversal is that the judgment was pronounced against appellant on the same day the verdict was rendered, and that this was violative of the provision of section 283 of the Criminal Code of Practice, and so prejudicially erroneous as to necessitate a reversal. Reliance is had upon the cases of Powers v. Commonwealth, 139 Ky. 815, 83 S. W. 146, 26 Ky. Law Rep. 1111, and Hansford v. Commonwealth, 170 Ky. 700, 186 S. W. 498.

In the Powers case it appears that, on the same day upon which the verdict was rendered, the appellant was required, over his protest, to file his motion and grounds for a new trial, which were required to be immediately argued by counsel, and were at once overruled by the court. At the time of filing his grounds and motion the appellant asked for additional time in which to file further grounds. This request was based upon the fact that his counsel had just finished a long and tedious trial, during which the sittings of the court had been held both day and night, that they were wearied by their prolonged labors, and that a few days time would enable them to produce additional grounds, which they did not then possess, in support of his motion. The accused especially insisted that the court should not pronounce judgment upon him in pursuance of the verdict of the jury until after the expiration of the time provided by the Code. These motions were overruled, and the judgment pronounced upon the same day the verdict was rendered. The contention was sustained in that case, under the circumstances shown on the ground that section 283 "was enacted for the express purpose of giving the accused sufficient time in which to show cause against the sentence about to be passed upon him."

In the Hansford case it appears that sentence was passed upon the appellant before the filing of his motion and grounds for a new trial. He had until the end of the term to file such motion and grounds. It also appears that the court was not about to adjourn for the term, and that it did not do so for more than a week thereafter. Under this state of case it was held that pronouncing sentence upon the defendant on the same day the verdict was returned was erroneous, but the court refused to re-

verse the case, because the defendant made no objection at the time.

In this case the record shows that upon rendition of the verdict the defendant produced and filed motion, and assigned fourteen separate grounds for a new trial, which, upon consideration, were overruled by the court. The record contains no intimation that any further time was needed to prepare additional grounds, or that any additional grounds could be produced, or that any additional time was needed in which to show cause why sentence should not be passed upon him. There then remained nothing else to be done except to pronounce judgment. The judgment recites that the court was about to adjourn, and it did adjourn for the term immediately thereafter. While the judgment concludes "to all of which the defendant objects and excepts," he has wholly failed to show that his substantial rights have been prejudiced by the judgment having been pronounced on the same day the verdict was returned.

In the case of O'Brien v. Commonwealth, 89 Ky. 354, 12 S. W. 471, 473, 11 Ky. Law Rep. 534, the verdict was returned on Saturday, and judgment pronounced on the following Monday. It was held that the two days provided for in section 283 means two juridical days, and that judgment should not have been pronounced until Tuesday; but the court further held "the appellant's motion in arrest of judgment and for a new trial had, however, been made and overruled before judgment was pronounced, and further delay could in no way have been beneficial to him. It was not therefore, a prejudicial error."

In this case the motion and grounds for new trial had been overruled, and, nothing having been shown or intimated necessitating any further action in the case, delay in pronouncing judgment could have in no way been beneficial to appellant. The action of the court, if erroneous, was not prejudicial to his substantial rights

3. The third ground relied on for a reversal is that instruction No. 2, given by the court, is erroneous in two particulars: (a) That there was no proof of a conspiracy between appellant and Will Farris; and (b) if there was any evidence authorizing a conspiracy instruction, the court should have qualified the instruction by further instructing the jury that, although they might believe

there was a conspiracy, yet, if they should further believe appellant had withdrawn from it before the killing, they should find him not guilty. In this contention appellant's counsel loses sight of, or ignores the testimony of, Mildred Martin. If she told the truth, Lula Kirchner was killed pursuant to a conspiracy, and, whether her testimony was true or false, it authorized the court to instruct the jury on conspiracy. The instruction given is:

"If you believe from the evidence beyond a reasonable doubt that the defendant, George Miller, in this county and before the finding of the indictment, on the——— day of August, 1928, conspired with Will Farris to kill Lula Kirchner, and that in pursuance and furtherance of such conspiracy, and in execution thereof and while the same existed, the defendant, George Miller, and the said Will Farris, or either of them, did wilfully, feloniously and with malice aforethought kill and murder the said Lula Kirchner by beating, bruising and wounding her on the head with a blunt instrument, a deadly weapon, a further description of which was unknown to the grand jury returning the indictment herein and from which beating, bruising and wounding she presently died in this county, then you will find the defendant guilty of wilful murder as charged in the indictment and fix his punishment at death or confinement in the penitentiary for life, in your discretion, according to the proof."

Inasmuch as that instruction required the jury to believe, beyond a reasonable doubt, that there was a conconspiracy, and that the killing was done pursuant to that conspiracy and *while it existed,* it was sufficient. There was no testimony necessitating the qualification contended for.

4. From the statement of facts hereinbefore set out, it will be observed that from time to time during the trial testimony concerning the death of Will Farris crept into the record. It is now insisted that this testimony was incompetent, and that it was an attempt to connect appellant with Farris' death. No objection was made to that testimony at the time of its introduction, and a great deal of it was put into the record by appellant himself. However, on page 584 of volume 4 of the transcript of evidence, appears this: "At the conclusion of all the evidence the court inquired of the defendant's attorneys if

they desired the evidence relative to the death and finding of the body of Will Farris excluded from the jury, and the defendant by attorneys requested the court to let it remain before the jury which the court did.'' In view of that action of the trial court and the defendant's request that the testimony be not withdrawn from the jury, he cannot now complain of it.

Finally, appellant complains that his motion for a bill of particulars was overruled. It has been held that the requirement from the commonwealth of a bill of particulars is within the sound discretion of the court, but subject to review in this court. Commonwealth v. C. & O. R. R. Co., 128 Ky. 749, 110 S. W. 253, 33 Ky. Law Rep. 92; Nickens v. Commonwealth, 228 Ky. 477, 15 S. W. (2d) 261. There is nothing in this record to entitle him to a bill of particulars. The indictment is simple; charges the crime in plain terms, the manner of its commission, and the person against whom committed. A bill of particulars could have gone no further.

This record discloses that the court granted the appellant a fair and impartial trial. The only complaint which has any substance is that the jury chose to believe the evidence of the commonwealth rather than that given in his behalf.

Perceiving no error, the judgment is affirmed.