## Bullock v. Commonwealth.

(Decided January 12, 1932.)

JOEL M. JONES for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

In the late afternoon of November 17, 1930, Guy Doan was assassinated while going home from work. The assassin fired a shotgun from within an abandoned log hut on the roadside. The appellant, James Bullock, has been convicted of the crime, and sentenced to life imprisonment.

The evidence against him is principally that a bloodhound, 24 hours or more after the killing, followed a trail from the cabin to his home some two miles away. It was also proven that the accused had made several threats against the deceased, although the cause of his enmity is not clear. Another circumstance was that the accused had hid out for several days after the crime, and after he learned that the bloodhound had trailed to his home; also that he ran upon the approach of the officers; and that after some sort of preliminary hearing, when it was indicated that his appearance bond would be increased, he escaped and avoided recapture for two or three weeks.

A precipitating motive is deduced from this evidence: About 8:30 in the morning of the day of the homicide, the deceased and the accused came to the home of Annie Barnes, and, according to her testimony, Doan said he had come to let her know that he had caught "Rag-head Bullock (the defendant) stealing Roosevelt Norton's chickens." He also said: "He turned up there to keep him from turning State's evidence on him"

(an incomprehensible statement without a context). To these statements the defendant made no response. Mrs. Barnes seems to have had some sort of grievance against him. The witness' young daughter testified to the same thing, and further said that the defendant at the time had a live chicken under the bib of his overalls. In that conversation, according to this witness and another, Bullock asked Doan which way he was going to his work at the coal mine, and he told him that he was going up the road like he always did.

The defendant denied ever making any threat or having ill-feelings against the deceased. He testified that he remained at home stripping tobacco on the afternoon on which the tragedy occurred, and stayed there that night. The next morning he went over to the house of a kinsman in Pulaski county nearby and worked for him. He was a farmer and a trapper. He denied learning of the act of the bloodhound, and undertakes to assign a reason for remaining away from home and his subsequent action because of the "scary" tales being told, and because he was out seeing about his traps. He testified his traps were on the other side of the hill from the abandoned cabin, but a witness in relating a conversation with the defendant in jail stated he had requested that he have his traps gathered up, and that one of them was near the hut. He had walked out with the crowd when his bond was increased in order to move his family away from the neighborhood to prevent them being killed, and because he didn't want to stay in jail until his trial. No witness sustains his alibi. There is opposing evidence that he was not at home during the afternoon, and his reputation for truth and morals was proven to be bad.

The commonwealth claims that the bits of evidence and links of circumstances form a chain binding the appellant to the commission of the crime. The appellant vigorously proclaims his innocence, and argues that the evidence did not warrant the verdict and is not sufficient to sustain it under the rule of a palpable inadequacy. We pass the point without comment or decision, for the judgment must be reversed for error in the admission of incompetent evidence.

It is claimed that the qualification of the bloodhound which made the trail from the cabin to the defendant's home was not sufficient to meet the tests demanded by

the authorities. See Pedigo v. Commonwealth, 103 Ky. 41, 44 S. W. 143, 19 Ky. Law Rep. 1723, 42 L. R. A. 432, 82 Am. St. Rep. 566; Blair v. Commonwealth, 171 Ky. 319, 188 S. W. 390; Id., 181 Ky. 218, 204 S. W. 67; Meyers v. Commonwealth, 194 Ky. 523, 240 S. W. 71, and the cases cited therein.

The extraordinary and almost uncanny attribute of the bloodhound, as stated in the Pedigo Case, begets in the minds of many people a suspicious awe, and they see in such an exhibition a direct interposition of divine Providence in aid of human justice. The very name of the animal has a direct tendency to enhance the impressiveness of the performance. Therefore, says the opinion, it would be dangerous in the extreme to permit the introduction of such testimony in a criminal case under conditions which did not fully justify its consideration as a circumstance tending to connect the accused with the crime. Perhaps it is something of this mysterious quality of evidence that has allured the writers of many opinions to enter rather elaborately upon its consideration from a legal standpoint. It has been so well and fully covered that we shall here resist the temptation, and merely refer the interested reader to the authorities cited.

Upon another trial, evidence may be introduced to prove more satisfactorily that the dog did possess the qualifications demanded by the rules of admissibility, as definitely laid down in Blair v. Commonwealth, 181 Ky. 218, 204 S. W. 67. We may also observe that the weakness of this character of evidence is accentuated in this case by the fact that there was no evidence that the cabin in which the tracks were found and which gave the dog his scent had been saved from intrusion by any one after the killing. A deputy sheriff testified he arrived there the next morning and remained until the dog came; that when he went away for dinner he left a guard with directions that he permit no one to enter the shack. But for aught that appears in the record, other persons did enter during his absence, and during the 18 hours intervening between the commission of the crime and his taking control of the premises. The integrity of the initial scent was not very satisfactorily established. See Sprouse v. Commonwealth, 132 Ky. 269, 116 S. W. 344.

We are of the opinion that the trial court committed prejudicial error in admitting in evidence the conversa-

tion between the deceased and Mrs. Barnes with reference to the apprehension of the accused in stealing Norton's chickens; not on account of its nature, for it appears to be competent upon the issue of motive, as the jury was instructed, but for the reason that it was not within the hearing of the accused. While the witnesses at first testified that the parties were close together and that he did hear the statements, it was clearly developed through their examination that he could not have done so. Mrs. Barnes was in her kitchen and the deceased was just outside talking with her through the window, while the accused was across a creek lying down on a far bank. They were talking in ordinary tones, and it appears in evidence that he was hard of hearing. She says he was something near 30 or 40 steps away; that she thought it was as far as from the witness stand as "the street over there (about 100 feet)." Roscoe McKinney was present during the conversation and, while testifying, pointed out an automobile in the street, about the same distance away, as being about the relative location of the two parties.

It is the universal and elementary rule of evidence that statements or conversations by third persons out of the defendant's presence or hearing are inadmissible when not a part of the res gestæ, or where the issue of conspiracy is not involved. So too are statements of the deceased in a homicide case regarded as hearsay to the same extent as those of any other person where his declarations cannot be admitted as of the res gestæ or a dying declaration, or, have not been communicated to the defendant so as possibly to influence his conduct. Roberson's Criminal Law, sec. 438; Parker v. Commonwealth, 51 S. W. 573, 21 Ky. Law Rep. 406. The difficulty often presented is whether the statements were or were not made in the presence or hearing of the accused.

In Pace v. Commonwealth, 170 Ky. 560, 186 S. W. 142, in relation to the statements admitted under somewhat similar conditions, it was written that the most that could be said was that the accused might or could have heard the statements had he been listening, and that if any presumption is to be indulged from the facts related it would reasonably be that, if he had heard the statement or accusation, some response or comment would have been induced. The defendant denied having heard this accusation, as well as having stolen any

804

chickens from Norton. For this error, we are constrained to reverse the judgment.

Complaint is also made to this statement by the commonwealth's attorney in his closing argument: "Go with me to a grave on a sunny hillside and the blood of Guy Doan is crying out that James Bullock killed me as I was riding from my work to my loving wife and chubby-handed little boy."

Out of regard for the stimulus of reasonable zeal on the part of the prosecutor and in recognition of an urge to forensic effort operating upon many lawyers, the courts allow some latitude for real or alleged oratory. Unless the hyperbole or rhetorical expressions transcend all reason and are but blood-thirsty and inflammable appeals, such declamations are not regarded as prejudicial errors. The statement in this case is something like a part of the argument condemned in Slaughter v. Commonwealth, 149 Ky. 5, 147 S. W. 751. But it was coupled with the declaration that the defendant's head should be cut off, hung on the end of a pole and carried through the streets of the city as an example to all others, and such other highly incendiary outbursts tending to excite the passion and prejudice of the jurors. The appeal might well have been omitted; but we do not regard it as a reversible error.

For the reason indicated, the judgment is reversed and the case remanded for a new trial.