## Bullock v. Commonwealth.

(Decided May 2, 1933.)

**2**

JOEL M. JONES for appellant.

BAILEY P. WOOTTON, Attorney General, FRANCIS M. BURKE, Assistant Attorney General, and B. J. BETHURUM, J. S. SANDUSKY and ROBERT B. BIRD for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This is a second appeal of this case. Bullock v. Com., 241 Ky. 799, 45 S. W. (2d) 449, 450. The facts as proven on the first trial are recited in our former opinion. The evidence that the bloodhound followed the trail from the scene of the murder to the accused's home, and also certain statements of deceased, were held improperly admitted.

Respecting the evidence as to the bloodhound following the trail from the scene of the murder to the accused's home, it is stated in our former opinion, "Upon another trial, evidence may be introduced to prove more satisfactorily that the dog did possess the qualifications demanded by the rules of admissibility, as definitely laid down in Blair v. Com., 181 Ky. 218, 204 S. W. 67."

As regards the evidence showing the statements of the deceased at the home of Mrs. Barnes which were admitted on the first trial, it was our conclusion, and so stated in our opinion, that it was not shown they were made in the presence or hearing of the accused, and not being a part of the res gestae, they were inadmissible. On a return of the case to the circuit court, the accused was tried again, convicted, and his punishment fixed at confinement in the penitentiary for life. He is now insisting that the record presented on this appeal is identical with that on the former, and that the evidence is not sufficient to support the verdict, and his conviction rests upon the same incompetent evidence which was presented on the first appeal.

The owner of the dog when being inquired of on cross-examination as to its pedigree was asked:

"Q. Do you know of your own knowledge whether or not this dog's father was a bloodhound? A. He looked to be, he was a bloodhound.

"Q. How do you know? A. Tell by looking.

"Q. He could have had something else in him? A. Yes sir.

"Q. You are not positive that he did not have? A. I am not sure if he did or not, I only know what the fellow I bought him from told me.

"Q. Then you do not know that the dog that made this trail is a bloodhound? A. On his mother's side he is.

"Q. But you don't know about his father? A. Know that is the dog we are talking about."

It is insisted that these answers show the incompetency of the evidence of the trailing of the bloodhound.

It will be observed that the witness was asked and was expected to give his positive knowledge as to whether the bloodhound used to follow the trail from the scene of the murder to the accused's home "had something else in him than that of a pedigreed bloodhound," a fact in the circumstances, humanly impossible to be within the knowledge of the witness. The owner of the dog used on the occasion in question testified that he possessed a certificate of pedigree of its mother but none of the father; that he owned both the father and the mother of the dog and had purchased them as full-blooded pedigreed dogs; that at the time he purchased the father, the owner represented to him that the dog was a pedigreed, full-blooded strain of bloodhound; that he had reared and trained the dog which was used on the occasion in question. The competency of the evidence showing the pedigree of the dog used on the occasion under consideration is vigorously attacked. A certificate of pedigree is a mere declaration of the line of ancestors. There is no difference between an oral statement of a line of ancestors of a dog and a certificate of pedigree, except in form. The one is no more hearsay evidence than the other; neither is hearsay evidence in its technical sense. Lightfoot v. State (Tex. Cr. App.) 58 S. W. (2d) 81, 82. The owner of the dog in question unequivocally stated that the individual from whom he purchased the male dog made an oral statement of its line of ancestry; that the dog in question was of a full-blooded strain of bloodhounds. Such must be regarded as sufficient for the purpose of show-

ing the lineage of the dog as if it was a written declaration of its line of ancestors. The owner details his knowledge of the pedigree of the dog used by him, and also the method he used in training it, the length of time it had been trained, and its aptness, accuracy, experience, qualifications, and dependability. The evidence on this subject-matter, which was absent on the former trial, as it is now presented, is sufficient to bring the evidence of the trailing by the dog from the scene of the killing to the home of the accused, within the rules laid down in the Blair Case which has been approved in many later cases. No error was committed in the admission of the evidence showing the trailing by the dog as detailed in the evidence. It is satisfactorily shown that immediately after the killing of the deceased, persons went to the scene of the killing, and that the inside of the house from which the shot was fired was protected from the intrusion of persons and there had been no defacing, mutilation, or destruction of the tracks on the dirt floor of the house, from which the dog trailed to the home of the accused, within 24 hours after the deceased was shot and killed. The deceased was walking in the road 12 feet from the door of an old house at the time he was killed, late on the afternoon of November 17, 1930, while returning to his home from work. The assassin fired the shot from within it. About 6 a. m. on the day he was killed, Doan and the defendant were at the home of Annie Barnes. On approaching her home they came from the direction of the home of Roosevelt Norton who lived in sight of the home of Annie Barnes. After they arrived at the home of Annie Barnes, he and Roscoe McKinney and the accused were together, about two steps apart. Doan asked McKinney if he wanted a job; McKinney responded that he did not care, when Doan remarked to him, "Come on and we will take a walk." But while standing there Doan made known to McKinney that he had caught the accused stealing Roosevelt Norton's chickens. He said, "McKinney, I will take you down and show you where he run and caught them." McKinney testified that at the time of this conversation Bullock was present within about two steps of them, in a position to hear every word of Doan, and that Bullock made no denial. Before they separated accused inquired of Doan which way he would return from work, when Doan informed him that he would go "by Roose-

velt Norton's, up the hollow, the way he always went"; they separated, the defendant started toward home. McKinney claims that he saw something in the right hip pocket of Bullock, "looked like a chicken." Berthe Barnes claims that she heard the conversation between Doan and McKinney at the home of Annie Barnes in the hearing of the accused. She narrates the conversation disclosed by the testimony of McKinney. She further testifies that at the time Doan and McKinney were talking, the accused was within two steps of them and took a chicken from behind him and "put it under his overall bib." "It looked like a Dominique chicken, it looked like it was grown."

Mrs. Roscoe McKinney claims that she was present, near enough to hear, and heard the conversation at the home of Mrs. Barnes of Doan and McKinney, and at that time the accused was within two steps of them; that she was within twenty-five or thirty steps of them, and plainly heard what was being said by Guy Doan; that the accused made no response to the statements of Doan, but when they started to separate, she heard him ask Doan "which way he would come from his work, and Doan said, 'Back to Roosevelt's and up the hollow.'" This is the road he was traveling when killed. She saw the accused, after he started off, take something from behind him and put it in front of him in his overalls. "It looked like a dark, looking chicken, or something about the size of a good frier." Roosevelt Norton and Mrs. Roosevelt Norton, whose chickens Doan charged the accused of stealing on the morning alluded to in the testimony of Roscoe McKinney, were not at home on that morning and, on returning home, they discovered two of their chickens were gone, one a red and the other a dominique. On the evening Doan was shot and killed Walter Deboard and others testify they were at the home of accused and he was absent. Several witnesses for the commonwealth testify that they were at the barn and at the residence of the accused, and that he was at neither place on that afternoon. The killing is supposed to have occurred about 6 o'clock. The accused's home was a short distance from where it occurred. The bloodhound trailed from the scene of the killing to his home on the evening next after the killing. He was not at home at that time. Amanda Bullock a daughter-in-law of the accused testi-

fied that about a month before Doan was killed the accused was at her home and said to her that Guy Doan and Irvine McKinney "came around the ridge whistling and holloing," and that he (the accused) ran out on a little hill to kill them, but "they got past before he got there." He stated to her he "aimed to kill them both but they got past before he got there." About one week after the killing, he came to her home in the night time, about 10 o'clock. She wanted him to go to bed, but "he just sat by the fire * * * and said he didn't want to go to bed." She made a bed by the fire and "he slipped his shoes and coat off and laid down." The next morning when talking to her about the bloodhound following the trail to his home, she claims, he asked her how the dog trailed, and when she told him, he said that "he came exactly that way that morning" (the day Doan was killed); that he had been over at the old house that morning setting traps. The accused stated to her that they had accused him of stealing chickens, and "that made the third time Guy had done him that way." Other witnesses for the commonwealth testified that the accused had admitted to them that he had made the tracks where the dog had trailed, but claimed he was engaged in setting traps at the time he did so. Numerous witnesses testify to threats he had made against Doan, on different occasions. Evidence was adduced showing that before daylight on the morning following the killing, the evening before, the defendant left his home. Other evidence shows that he secluded himself and evaded arrest for approximately a week. When the officers located and attempted to arrest him, he endeavored to escape. After his arrest and while the court was in the act of fixing his appearance bond, he again escaped and secreted himself for an indefinite time, during which time the officers were endeavoring to locate and rearrest him. When they located him, he again attempted to escape. His defense is a denial. He asserts that he was trapping on the morning he and Doan were at the home of Mrs. Barnes. He acknowledged that Mr. and Mrs. Roosevelt Norton were not at home on the morning he was charged by Doan with stealing their chickens. He claims that he did not hear or understand Doan to accuse him of stealing chickens; that his hearing was defective. After they separated, he claims he returned to his home and stripped tobacco at his barn until after

dark. He was under promise to Norton to work for him on the day following the killing of Doan, but instead of complying with his promise, he left his home about 4 o'clock in the morning and went to Pulaski county where he remained for several days, when he returned home and hid himself until he was arrested. His explanation for remaining away from home and hiding out is that he apprehended danger at the hands of the friends of Doan. He admits that on the day of the killing of Doan he was in the vicinity of the old log hut from which the shot was fired that killed Doan, but claims he was setting traps. He denies that he was in it or made any tracks therein. His daughter corroborates him as to stripping tobacco until after dark on the evening of the day Doan was killed. In his testimony on cross-examination he fails to explain his conduct on the day of the killing and following the killing. He admits that the relationship of himself and daughter-in-law and the other witnesses of the commonwealth was cordial, and they had always been friendly.

The evidence showing his guilt is entirely circumstantial. It was for the jury to weigh it and determine the credibility of the defendant and his witnesses. It cannot be doubted that the evidence was sufficient to authorize the submission of the case to the jury, although it was circumstantial. It has been often enunciated by this court that a conviction may be had on circumstantial evidence alone, although it is sometimes looked upon with suspicion, where all the links supplied in the chain of circumstances are sufficient to justify a conviction. Smith v. Com., 140 Ky. 599, 131 S. W. 499; Slaton v. Com., 193 Ky. 449, 236 S. W. 952; Newton v. Com., 222 Ky. 817, 2 S. W. (2d) 661; Dorsey v. Com., 158 Ky. 447, 165 S. W. 405. But circumstantial evidence to justify a conviction must point unerringly to the accused's guilt (Hall v. Com., 149 Ky. 42, 147 S. W. 764), and it must do more than create a suspicion of guilt. Moore v. Com., 229 Ky. 765, 17 S. W. (2d) 1021. To be sufficient to sustain a conviction it must exclude every reasonable hypothesis of innocence. Mattingly v. Com., 195 Ky. 838, 243 S. W. 1044; Woodall v. Com., 230 Ky. 698, 20 S. W. (2d) 722. If the circumstances tending to show his guilt are as consistent with the defendant's innocence as with his guilt, they are insufficient. Mullins v. Com., 196 Ky. 687, 245 S. W. 285;

Johnson v. Com., 217 Ky. 705, 290 S. W. 693. To be sufficient such evidence must be consistent with every reasonable inference of his guilt and inconsistent with his innocence. Newton v. Com., 222 Ky. 817, 2 S. W. (2d) 661. The argument that defendant was convicted on mere suspicion was presented on the former appeal, but the case was not reversed on this theory, but solely because of the errors in the admission of evidence. The commonwealth on the second trial not only conformed to the rules prescribing the competency of the evidence which was rejected in our former opinion, but it established the charge against the accused by other and additional evidence.

The question of his guilt was one peculiarly within the province of the jury. We are forbidden from reviewing the evidence to determine if it justifies a conviction (Cornelius v. Com., 54 Ky. [15 B. Mon.] 539); nor is it our province to pass upon the facts other than determine whether there is any evidence to support the verdict (Cornett v. Com., 156 Ky. 795, 162 S. W. 112), unless the verdict is manifestly wrong or palpably against the weight of the evidence (Miller v. Com., 231 Ky. 527, 21 S. W. (2d) 840; Ritchie v. Com., 243 Ky. 479, 48 S. W. (2d) 1072), and, if there is any evidence affording grounds on which the jury's verdict might be sustained, it is considered neither wrong nor palpably against the weight of the evidence (Newsome v. Com., 240 Ky. 333, 42 S. W. (2d) 306, Barton v. Com., 240 Ky. 786, 43 S. W. (2d) 55, Tussey v. Com., 241 Ky. 91, 43 S. W. (2d) 351).

Viewing the evidence most favorably to the accused, but adhering to these general rules, we find no grounds for reversal presented in the record or brief.

Therefore the judgment is affirmed.